UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| PLAYMORE INC., PUBLISHERS | Case No. 07-cv-3057 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| WALDMAN PUBLISHING CORP., | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - -

Plaintiff, Playmore Inc., Publishers ("Playmore"), by its attorneys, Fox Rothschild LLP, as and for its Complaint, alleges as follows:

## THE PARTIES

1.      Playmore is a New York corporation, which maintains its principal place of business at 58 Main Street, Hackensack, New Jersey 07601.

2.      Defendant, Waldman Publishing Corp. ("Waldman") is a New York corporation, which maintains a regular and established place of business at 570 Seventh Avenue, Suite 800, New York, New York 10018.

## JURISDICTION AND VENUE

3.      This action arises under the copyright laws of the United States, 17 U.S.C. §§ 101 et seq.  This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b).

4.      This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

5.      Venue is predicated upon 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391(b)(1) in that

1

Defendant's principal place of business is in the Southern District of New York.

## BACKGROUND

### The Partnership

6.        Prior to March 16, 2007, for more than 25 years, Playmore and Waldman, which had previously been independent publishers and direct competitors, had been equal partners in the development, production, marketing, distribution, and sales of thousand of products, including, among other things, children's books (the "works"). This partnership had been generally successful, typically generating over $25,000,000 in sales annually.

7.        Playmore handled sales and marketing of the works to the retail and wholesale trade, which involved, among other things: instructing Waldman what new product line to create and what text and illustrations were required;  instructing Waldman on what orders to place with printers, including quantity, time frame, packing and labeling requirements; and deciding what "sku" would be discontinued.

8.        Waldman placed print orders with printers based on Playmore's instructions, and reviewed open and booked orders entered by Playmore into the partnership's jointly accessible AS400 computer operating system.

9.        Waldman also was responsible for organizing the creation of editorial content, by: (1) using in-house Waldman employees to develop text based on the complexity of the material; and (2) finding designers to develop graphic designs and complex text, who, upon information and belief signed a writing that the relationship was a work-for hire with Playmore and Waldman and/or that the artist assigned all of its rights to Waldman and Playmore.  Playmore was involved at every stage of the hiring and development of editorial content, whether performed in-house or outside, critiquing and advising as to the look and feel of the product, as well as paying on a monthly basis 50% of all costs and expenses of the story writers, graphic designers, illustrators

2

and artists, and 50% of in-house Waldman employee salaries later at periodic "equalization."

10.     Of the hundreds of millions of copies of works sold by the partners, virtually all of them have imprinted the Playmore and Waldman copyright notice and the "bug" logo, jointly trademarked to the partners. Almost all works contain the UPC Bar code number prefix 0-70097, which has been assigned by the UCC Council (now known as GS1) and is owned by Playmore alone.

11.     For many years, Playmore's principal office, Waldman's principal office, and the Massachusetts warehouse, where inventory was (and is currently) stored and customer orders are fulfilled ("Massachusetts warehouse"), were connected via a T1 internet connection for email.

12.     All 3 locations were also connected to the AS400 computer operating system, which the partners shared. This system was (and is) located at Playmore's office, and Playmore was responsible for entering all customer files, orders, accounts receivable, and item set-up information into the system. Waldman entered all expected new inventory directly into the system. All customer billing was done through the AS400 system, and Waldman reviewed this on a daily basis.

13.     From the T1 line, Playmore transmitted bills of ladings to the Massachusetts warehouse for shipment by Waldman. At the end of each day, the warehouse would email Playmore a report showing all orders shipped that day, and then Playmore would invoice the customer. Playmore carried the cost of the account receivables on its books, which the parties then "equalized" at a later date, as per the partnership arrangement.

14.     Waldman personnel working at the Massachusetts warehouse would handle all packing, stickering and shipping of Playmore orders to customers. All master cartons containing works shipped to customers were ordered by Waldman, but stated "Playmore Inc., Publishers"

3

on them. Every day, Playmore and Waldman staff spoke about how to execute orders properly.

15.          Waldman paid the printers for delivered product pursuant to contracts between Waldman and Playmore, and various printers. Waldman carried the cost of this inventory on its books, which the parties then "equalized" later, as per the partnership arrangement.

16.          Playmore paid for certain warehouse supplies and equipment. Waldman, among other things, would order supplies, such as the retail stickers directly applied to works, and then invoice Playmore for these supplies. Playmore, among other things, purchased equipment directly for the Massachusetts warehouse, and shipped it there for its use.

17.          The T1 internet connection and AS400 contract for all 3 locations has always been, until recently, in Playmore's name alone, and billed to Playmore. A few months ago, Playmore informed Waldman it was switching internet carriers for cost saving purposes. Playmore advised Waldman of the time that the internet carrier was switching over, and advised Waldman to establish its own internet service.

18.          Since at least 1984, despite being two separate corporations, Waldman and Playmore have shared 50/50 in all profits, losses, and expenses of the partnership. The process for "equalization" between the partners has generally been precisely the same method for over 20 years.

19.          On a monthly basis, Playmore provided a Cost of Sales ("COS") report to Waldman, which showed all product shipped for the prior month, including the total cost of product and total sales of product. Playmore paid Waldman 100% of the cost of the product, plus 50% of the profit realized.

20.          On a monthly basis, Waldman sent an invoice to Playmore for: (1) the total amount paid for all cardboard material paid for that month, including master cartons, displays,

4

crayons, markers, and other promotional material used to help sell product; and (2) the total of amount paid for art and editorial by Waldman, which mostly included payments to story writers, graphic designers, illustrators and artists. Playmore paid Waldman 50% of each of these invoices.

21.      Additionally, typically 4 times a year (except the last two years, where the parties did it semi-annually), Playmore and Waldman would "equalize" all expenses paid to run their respective companies (except executive compensation). Both partners provided each other with a summary of all profits, costs, and expenses during that period, and if one partner had spent more than the other partner, it would be reimbursed by the other partner, in order to make the partners' expenses and losses equal.

22.      Any additional income received by Playmore, which was not in the monthly COS report, such as royalty income received, was also equalized at this time.

23.      Playmore and Waldman would further equalize any disparate costs for carrying the accounts receivable and inventory, respectively.

24.      Consistent with the parties' long-standing partnership, since at least 1985, by written agreement, both partners have had a "50% share in all rights, titles, and interests, including all copyright and trademark rights, in an to all published works and original art work incorporated into said published works where Waldman Publishing Corp. and Playmore, Inc, Publishers, are both indicated as being copyright owners of the works." See Joint Copyright Agreement annexed hereto as Exhibit "A"

25.      Since the Joint Copyright Agreement, Playmore and Waldman have acted consistently with the intent and exact language of the writing, by jointly publishing thousands of different children's books titles, and publishing hundreds of millions of copies of works, each of

5

which indicated, typically on the title page, that they were joint copyright owners of the covers and/or text of the works.

26.     Any materials where Waldman only is held out as the sole copyright owner, of either the text or cover, relates to materials developed by Waldman alone prior to the Joint Copyright Agreement.

27.     The Joint Copyright Agreement, executed on Waldman letterhead, was signed and dated by then Vice President Herschel Waldman, of Waldman, and thereafter signed and dated by President Robert Horwich, of Playmore.

28.     Consistent with the parties' long-standing partnership and the Joint Copyright Agreement, the partners have typically joined forces in legal battles to protect the partnership and their jointly owned intellectual property. Charles Guttman, Esq., who counseled Playmore about protecting its intellectual property rights in 1985, is the same attorney, until his recent death, who typically handled Playmore and Waldman legal issues concerning its joint intellectual property rights.

29.     As recently as 2001, in trademark litigation where a third-party was trying to use the trademark "Playmore," Waldman joined with Playmore to protect not only the recognition and renown of Playmore's trade name, but the Waldman/Playmore trademark, and in essence, the partnership. The documents filed in the case by Waldman's and Playmore's attorneys, Proskauer Rose LLP ("Proskauer"), refer to the two parties as a "joint venture," which worked "jointly" for more than two decades, and were a commercial success.

### Defendant's Conduct

30.     Without Playmore's knowledge and when the partnership was still ongoing, on or about March 14, 2007, Michael Gober ("Gober"), COO of Waldman, sent a written agreement to

Richard Baldassarre ("Baldassarre"), of RJB Industries ("RJB"), Waldman and Playmore's agent

for printing all of its product for approximately the past 17 years. With fraudulent intent and in

patent bad faith, and without any explanation to Baldassarre, Gober inserted a clause into the

agreement stating that "The Parties to This Agreement Will Ship Inventory Only As Expressly

Instructed and Authorized in Writing By Michael Gober of Waldman Publishing Corp."

Because during the 17 years in which RJB worked with Playmore Baldassarre believed the

companies were partners, he apparently signed the agreement under the (mistaken)

understanding that Gober's insertion referred to the Playmore/Waldman partnership.

31.    Without Playmore's knowledge, on or about March 16, 2007 at 3:05 p.m., Gober

sent a blind email to himself, which was received by Joan I. Baldassaree, of RJB, giving notice

that as of that day all inventory orders were being put on hold, and that no orders should be

shipped without written permission from Gober, including Waldman orders "in process that are

about to be shipped or picked up for shipment to Playmore." Upon information and belief, RJB

was not the only company that received this email blindly sent by Mr. Gober to himself.

32.    Approximately 3 hours later, on or about March, 16, 2007 at 6:55 p.m., Jerry

Cohen, of the law firm of Cohen Tauber Spievack & Wagner LLP, without comment or any

explanation, wrote an email on behalf of his client Waldman, to John Horwich, President of

Playmore, attaching a purported Term Sheet and Distribution Agreement, which completely and

materially changed the parties' relationship for the sale and distribution of inventory to fulfill

customers orders, which was in place for over 25 years.

33.    On April 2, 2007, Playmore's attorney wrote an email to Laurence S. Tauber,

Esq., of the law firm of Cohen Tauber Spievack & Wagner LLP, demanding that, should

Waldman self-publish, it must account to Playmore in accordance with Playmore's copyright

7

ownership. Playmore further stated that it reserved the right to print and sell product consistent with its statutory and other legal rights concerning its copyright ownership.

34.      Three days later, on April 5, 2007, on or about 7:22 p.m., Laurence S. Tauber, Esq., wrote an email on behalf of Waldman to Playmore's attorneys stating that Waldman is the sole legal owner of all copyrights, and is not under any duty to account to Playmore. Mr. Tauber requested that Playmore turn over the Joint Copyright Agreement.

35.      Only 42 minutes later, on April 5, 2007, at 8:04 p.m., Gober sent an email to Joan I. Baldassarre of RJB concerning Waldman's alleged intellectual property rights, and copied 4 individuals at RJB's Asian counterpart Tri-King.

36.      In the email, Gober stated that Waldman is "very focused on protecting [its] intellectual property," and then falsely stated that Waldman had provided RJB with Waldman's "intellectual property under the terms of agreements over many years (e.g., 3/14/07, 4/7/06, and the many years preceding), which include [RJB] not printing [Waldman's] books under any circumstances without [Waldman's] permission." Gober then falsely stated that "I suspect you may have been informed otherwise by Playmore, but Waldman is 100% owner of the copyrights associated with all of its books."

37.      Gober further demanded that RJB provide written confirmation of its intention to print exclusively for Waldman by falsely stating that this was the type of arrangement that had always been in place between the parties.

38.      Upon information and belief, in response to Gober's offer to have RJB speak directly to Waldman's "IP attorneys" for confirmation, RJB contacted Gober, who directed RJB's counsel to speak with Proskauer.

39.      Upon information and belief, RJB's counsel advised RJB to await the outcome of

this suit before printing for Playmore works where Waldman disputes copyright ownership.

40.        Upon information and belief, out of fear of liability, RJB relayed Waldman's false statements to its printers, The Bright (China) and PT Kapasari (Indonesia), printers with whom the partnership had jointly contracted with for 12 years and 16 years, respectively.

41.        RJB, Tri-King, The Bright, and PT Kapasari have refused to print and ship Playmore product where Waldman disputes the ownership of the copyrights at issue, out of fear of liability from Waldman. This includes, but is not limited to, over $200,000 in orders that were placed and printed with Playmore and Waldman copyright notices, as well as the Playmore/Waldman bug logo, when the partnership was ongoing.

### Additional Facts Common to All Claims

42.        Beginning on March 16, 2007 and continuing to the date of filing herein, Playmore and Waldman have been unable to come to any agreement concerning the distribution of inventory jointly owned by the parties, already printed and sitting in the parties' Massachusetts's warehouse, with notices of copyrights and trademarks jointly owned by the parties, as well as bearing the UPC Bar codes solely owned by Playmore.

43.        The Massachusetts warehouse contains excess inventory based on Waldman's and Playmore's projections of new orders that will be received. This amount is determined by both partners analyzing the AS400 system.

44.        Prior to March 16, 2007, there was approximately $2,500,000 in inventory in the Massachusetts warehouse, bearing Playmore and Waldman copyright notices, "bug" trademark, and Playmore's UPC Bar code number.

45.     The UPC Bar code is used by all retailers, domestically and internationally, to not only track the sales of an item, but to assign all items with a specific UPC prefix to a specific vendor/supplier, such as Playmore.

46.     Upon information and belief, after filling all pre-March 16, 2007 purchase orders, there will be approximately $2,000,000 in inventory left in the Massachusetts warehouse, bearing Playmore and Waldman copyright notices, "bug" trademark, and Playmore's UPC Bar code number.

47.     Playmore and Waldman have been unable to reach an agreement as to how to distribute this remaining product in the Massachusetts warehouse.

48.     To permit Waldman to sell or distribute this remaining product, which not only shows Playmore's joint copyright, trademarks and logo, but Playmore's UPC prefix, to any party other than Playmore or Playmore's customers, would be devastating to Playmore's ability to maintain control over its business moving forward.

49.     This would also likely result in mass confusion to customers, who have this UPC Bar code assigned to Playmore, and have been tracking these sku's in the marketplace for years, by, among other things, causing customers: (1) to re-order product with Waldman, instead of Playmore; (2) to pay invoices to Waldman for monies due and owing to Playmore; and (3) to track sales, which is the basis for renewed programs, to Waldman, instead of Playmore.

50.     Even if Playmore were to create entirely new product, it is Playmore's right and common practice to maintain the same UPC Bar code number from a discontinued sku to a new one if it is the same topic or a comparable replacement. As such, even if the parties develop and print their own product in the future, if Waldman uses Playmore's UPC Bar code in the marketplace, it will have the same devastating and confusing effect in the marketplace.

NY1 29147v1 04/16/07

## COUNT I – DECLARATORY JUDGMENT

51.    Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

52.    Upon information and belief, certain of the copyrights at issue were developed as works made for hire at the commission of and for Playmore and Waldman.

53.    Playmore was intimately involved in all stages of the development of the copyrighted materials by: (1) meaningfully participating in the creation of ideas for illustrations and text by Waldman employees, story writers, graphic designers, illustrators and artists; (2) critiquing, revising, altering, and/or modifying the materials before they became the final work; and (3) paying for 50% of all expenses and costs for its development, including, among other things, salaries of Waldman employees, compensation to story writers, graphic designers, illustrators and artists, and supplies, equipment, and workspace.

54.    In accordance with the parties' more than 20 year course of conduct, Playmore and Waldman have included joint copyright notices on virtually all of its works, typically on the title page, announcing that Playmore and Waldman are joint copyright owners of the covers, illustrations, and/or text.

55.    By virtue of the work for hire status of the copyrighted works at issue, Playmore and Waldman are joint authors of certain of the copyrights at issue. Upon information and belief, in the alternative, there are work for hire contracts between Playmore, Waldman, and the story writers, graphic designers, illustrators and artists.

56.    Under §201 of the Copyright Act, joint authors are co-owners of copyrights.

57.    Playmore immediately intends to self-publish product using all of the copyrights

at issue. Since Playmore owns the copyrighted works at issue, the necessary work to create products is already completed.

58.      The only remaining step in the production process is to instruct the printer and Playmore's new fulfillment center to carry out production and distribution. Playmore has, in fact, located a new fulfillment center, from which it has already received a contract, and intends to execute forthwith.

59.      Playmore contracted with a United States printer for the printing of Playmore product, and Playmore's current agent and printers in Indonesia and China have agreed to coordinate and print Playmore product following a successful disposition of this lawsuit (since they currently fear liability to Waldman).

60.      On April 5, 2007, Waldman, through counsel, emailed Playmore's counsel, and repudiated Playmore's ownership of the copyrights at issue, and stated that it refused to account to Playmore in accordance with Playmore's copyright ownership rights.

61.      On April 5, 2007, Waldman, through Gober, conveyed to RJB, and 4 individuals at Tri-King, that despite what Playmore may have instructed RJB, Waldman is the sole legal owner of all copyrights at issue.

62.      The printers in Indonesia and China now refuse to print for Playmore pending the resolution of this dispute, out of fear of liability to Waldman.

63.      As a direct result of Waldman's conduct, Playmore cannot print or distribute its already printed works, and also has a real and legitimate fear of liability should it go out and self-publish the works.

64.      Accordingly, an actual controversy exists between Playmore and Waldman, and Playmore is entitled to a judgment declaring that: (1) defendant is not the sole owner of rights,

titles, and interests, including all copyright and trademark rights, in and to certain published works and original art work incorporated into said published works where Waldman and Playmore are both indicated as being the copyright owners of the works; (2) that defendant is enjoined from so contending and falsely publishing to third parties; and (3) that plaintiff is 50% owner thereof.

65.    Plaintiff has no adequate remedy at law, because without Playmore's ability to self-publish product using the copyrights at issue, Playmore will continue to suffer irreparable harm, such as loss of its workforce, disruption and cessation of business operations, harm to its business reputation, loss of goodwill with its customers and the consumer public, and ultimate closing of its business.

66.    Plaintiff requests a speedy hearing and expedited discovery on this issue.


## COUNT II – DECLARATORY JUDGMENT

67.    Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

68.    Under the Joint Copyright Agreement, Playmore and Waldman mutually assigned and transferred to each other a 50% interest in all copyrights where Playmore and Waldman held themselves out as the joint owners of the works.

69.    Under §204 of the Copyright Act, a writing evidencing intent to assign copyrights, signed by the assignor, is sufficient to assign interests in copyrights.

70.    As stated in paragraphs 57-64 above, an actual controversy exists between Playmore and Waldman.

71.    Accordingly, Playmore is entitled to a judgment declaring that: (1) defendant is

NY1 29147v1 04/16/07

not the sole owner of rights, titles, and interests, including all copyright and trademark rights, in and to all published works and original art work incorporated into said published works where Waldman and Playmore are both indicated as being the copyright owners of the works; (2) that defendant is enjoined from so contending and falsely publishing this to third parties, and (3) that plaintiff is 50% owner thereof.

72.      Plaintiff has no adequate remedy at law, because without Playmore's ability to self-publish product using the copyrights at issue, Playmore will continue to suffer irreparable harm, such as loss of its workforce, disruption and cessation of business operations, harm to its business reputation, loss of goodwill with its customers and the consumer public, and ultimate closing of its business.

73.      Plaintiff requests a speedy hearing and expedited discovery on this issue.

## COUNT III – COMMON LAW TORT OF UNFAIR COMPETITION

74.      Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

75.      Playmore and Waldman jointly own the copyrights and have for over 20 years shared equally in all costs, expenses, and labors to develop, produce, and market their intellectual property and the works.

76.      Waldman has falsely represented to third parties that it is the sole owner of the copyrights at issue, when the parties are joint owners of all copyrights, and shared equally in all costs, expenses, and labors to develop, produce, and market the intellectual property and the works. Upon information and belief, Waldman has falsely represented this to other third parties,

14

including, but not limited to, printers, vendors, and customers, in order to harass and intimidate them for contracting with Playmore.

77.    Waldman has created confusion in the marketplace and/or there is a likelihood of confusion in the marketplace. Waldman has attempted to deceive third parties about the origin of the copyrights at issue. Waldman's misappropriation consists of falsely designating that the copyrights originated, were sponsored, or have a connection only with Waldman, thus depriving Playmore of its costs, expenses, labors, and development.

78.    Upon information and belief, Waldman has received a commercial benefit from its misappropriation. Upon information and belief, Waldman continues to receive a commercial benefit by representing that the partnership assets are owned solely by Waldman, when in fact, Playmore and Waldman jointly own the copyrights and shared in all costs, expenses, and labor to develop, produce, and market the intellectual property and the works.

79.    Waldman acted intentionally, with extreme bad faith, and with malice, in making these false statements in order to, among other things, put its long-time partner, Playmore, out of business. Waldman's conduct is morally culpable to an extreme degree.

80.    Waldman has taken advantage of Playmore's expenditures, skill, and labors to develop, produce, and market the intellectual property and the works.

81.    These false statements are related and/or concern a substantial question concerning the Copyright Act.

82.    Due to Waldman's conduct, Playmore has been damaged in an amount to be determined at trial.

## COUNT IV – TRADE LIBEL

83.       Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

84.       As a direct and proximate result of Waldman's conduct, Playmore has suffered economic and pecuniary harm because, out of fear of liability: (1) RJB, The Bright, and PT Kapasari are refusing to arrange for the shipment and/or ship currently over $200,000 in product that has already been printed with Waldman/Playmore copyrights and the Playmore owned UPC Bar codes, to Playmore/Waldman customers, some of which who have cancelled orders, and have now threatened to refuse to do future business with Playmore; (b) RJB has refused to arrange for the printing of additional product with copyrights where Waldman disputes Playmore's ownership of copyrights; (c) The Bright and PT Kapasari have refused to print additional product with copyrights where Waldman disputes Playmore's ownership of copyrights; and (d) Playmore's customers have threatened to sever the relationship, including, but not limited to, CVS Pharmacy.

85.       Due to Waldman's conduct, Playmore has been damaged in an amount to be determined at trial.

## COUNT V – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

86.       Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

87.       Waldman was and is aware of the relationship between Playmore and RJB, Tri-King, The Bright, and PT Kapasari.

NYI 29147v1 04/16/07

88.     Playmore has been prevented from consummating an agreement with RJB, Tri-King, The Bright, and PT Kapasari, and but for these statements by Waldman, these parties told Playmore that they would be arranging for and printing Playmore products with the copyrights at issue.

89.     Playmore's business relationship and goodwill has been injured as a result of the actions of Waldman.

90.     Due to Waldman's conduct, Playmore has been damaged in an amount to be determined at trial.

## COUNT VI – BREACH OF FIDUCIARY DUTY

91.     Playmore hereby incorporates by reference all preceding paragraphs of the Complaint as if set forth herein at length.

92.     Playmore and Waldman were a partnership and/or joint venture for, at a minimum, 20 years, since both parties equally shared in the profits, losses, and expenses of both companies.  Based on writings and the parties' course of conduct, the parties intended to be a partnership and/or joint venture.

93.     Both parties contributed property, financial resources, effort, skill and knowledge, commingling all of their properties and interests.

94.     Both parties shared equal control and management over the partnership.

95.     As a partner of Playmore, Waldman owed a fiduciary duty to Playmore while the partnership was ongoing.

96.     Waldman's duty to Playmore included a duty not to favor its own interests over Playmore's interest, and not to appropriate opportunities or business of the partnership for its own advancement at the expense of Playmore.

17

97.     Waldman's duty further included the preservation of the partnership assets, including inventory printed by third-parties, and inventory jointly owned by the parties in the Massachusetts warehouse, prior to the dissolution of the partnership.

98.     Waldman violated its fiduciary duty prior to the dissolution of the partnership, in the following respects: (1) inducing RJB to sign the agreement on March 14, 2007 that it would only ship inventory, which included Playmore/Waldman jointly owned inventory, upon written confirmation by Waldman; (2) contacting RJB, and demanding that RJB stop shipping goods, including over $200,000 in orders about to picked up by Playmore, because of inventory, and claiming that Playmore was aware of this; (3) shutting down warehouse operations and refusing to ship orders placed during the existence of the partnership at the cost of revenue, customer relationships, and goodwill; (4) proposing a change in distribution of jointly owned Playmore and Waldman copyrighted works with Playmore UPC Bar code, which was already in the Massachusetts warehouse prior to dissolution; (5) fraudulently alleging that the March 14, 2007 agreement  evidenced Waldman's exclusive interest in the intellectual property and; (6) claiming that the copyrighted works are not joint partnership property, when there is written agreement to the contrary, and publishing this to third parties to harm Playmore; and (7) upon information and belief contacting vendors of the partnership and advising them to deal only with Waldman.

99.     As a direct and proximate cause of Waldman's breach of its fiduciary duties, Playmore was harmed and has suffered in an amount to be determined at trial.

100.     Playmore further demands an accounting of partnership affairs and assets as of the date of dissolution.

NY1 29147v1 04/16/07

WHEREFORE, Plaintiff requests that the Court grant a speedy hearing and expedited discovery, and:

(1) issue preliminary and permanent injunctive relief restraining Defendant, its officers, agents, attorneys, servants, and employees, and those acting in concert and participation with them, including without limitation, the law firm of Proskauer Rose LLP, from

(a) engaging in, causing, authorizing, ratifying, permitting, or in any other manner fostering either directing or indirectly future defamatory statements about Playmore's ownership in copyrights, or any other rights, titles, and interests concerning works where Waldman and Playmore are both indicated as being the copyright owners of the works;

(b) interfering in any way with Plaintiff's rights, titles and interests in copyright and/or trademarks of the Works, including without limitation wrongfully stating to printers, vendors and/or customers of Plaintiff and/or Defendant, that Plaintiff has no ownership interest in copyright and/or trademarks in the works or that Waldman has sole ownership of the copyright and/or trademarks in the works;

(c) interfering in any way with Plaintiffs publishing any or all of the works;

(d) selling or shipping the inventory currently in the Massachusetts warehouse to any party other than Playmore, or customers with orders with Playmore or Playmore and Waldman.

(2) issue preliminary and declaratory relief declaring that defendant is not the sole owner of rights, titles, and interests, including all copyright and trademark rights, in and to all published works and original art work incorporated into said published works where Waldman and Playmore are both indicated as being the copyright owners of the works;

(3) issue preliminary and declaratory relief declaring that Playmore is 50% owner of all copyrights, or any other rights, titles, and interests concerning works where Waldman and Playmore are both indicated as being the copyright owners of the works;

(4) issue preliminary and permanent relief directing Waldman to ship inventory in the Massachusetts warehouse to all customers who placed orders with Playmore prior to March 16, 2007;

(5) enter a judgment in Playmore's favor, and against Defendant, for no less than $5,000,000 in compensatory damages, exclusive of interest;

(6) enter a judgment in Playmore's favor, and against Defendant, for no less than $50,000,000, in punitive damages;

(7) award Plaintiff interests, costs, and disbursements, together with attorney's fees; and

(8) grant such other and further relief, to which this Court deems just and proper.

Dated: April 16, 2007
     New York, New York

                  FOX ROTHSCHILD LLP
                  Attorneys for Plaintiff

                  By:
                  Richard B. Cohen, Esq. (RC 5103)
                  John Wait, Esq. (JW 2558)
                  100 Park Avenue, Suite 1500
                  New York, New York 10017
                  T: (212) 878-7900
                  F: (212) 692-0940

# EXHIBIT A

# Waldman Publishing Corp.

18 EAST 41ST STREET • NEW YORK, NEW YORK 10017 • (212) 725-2375
CABLE ADDRESS: WALDPUB NEW YORK

TO WHOM IT MAY CONCERN:

This is to acknowledge that Waldman Publishing Corp. and Playmore, Inc., Publishers, have previously entered into an agreement whereby, for valubable consideration received, each of them owns a 50% share in all rights, titles, and interests, including all copyright and trademark rights, in and to all published works and original art work incorporated into said published works where Waldman Publishing Corp. and Playmore, Inc, Publishers, are both indicated as being the copyright owners of the works.

Date: 7/23/85

WALDMAN PUBLISHING CORP.

By: _____

Title: _____

Date: 8/1/85

PLAYMORE, INC., PUBLISHERS

By: _____

Title: _____