UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                          :

PLAYMORE INC., PUBLISHERS,         :

                             :     Case No.: 07 CV 3057

               Plaintiff,    :     (LBS)

                             :

         v.                  :

                             :

WALDMAN PUBLISHING CORP.,     :

                             :

              Defendant.   :

                             :
-------------------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW IN
## <u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>

**COHEN TAUBER SPIEVACK & WAGNER LLP**
Stephen Wagner (SW 2900)
Sari Kolatch (SK 3026)
Yamuna Bhaskaran (YB 8650)
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 586-5800
*Attorneys for Defendant*

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Thomas Kjellberg (TK 0605)
1133 Avenue of the Americas
New York, New York 10036
(212) 790-9200
*Co-Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ................................................................................................ i

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

ARGUMENT ....................................................................................................... 7

I.    Playmore Seeks a Mandatory Injunction, but Fails
to Satisfy the Stringent Burden of Proof to Obtain One .......................... 7

      A.    Playmore Will Not Succeed on the Merits
of Its Declaratory Judgment Claims ......................................... 10

      B.    Plaintiff Will Not Succeed on the Merits
of its Breach of Fiduciary Duty Claims .................................... 15

          i.   The Parties Were Neither Partners Nor
Joint Venturers .............................................................. 15

          ii.  Even If There Was a Partnership, Playmore's
Fiduciary Claim Still Fails ............................................ 18

      C.    Playmore has no Likelihood of Success on the
Merits of its claim for Tortious Interference with
Prospective Contractual Relations ............................................ 19

      D.    Playmore Will Not Succeed on its
Unfair Competition Claim ......................................................... 22

      E.    Playmore Will Not Succeed on its Trade Libel Claim ............... 24

II.   Playmore Will Not Suffer Irreparable Harm ........................................... 25

III.  Playmore Has Not Presented Fair Grounds For Litigation, and
The Balance of the Hardship Weighs in Waldman's Favor ................... 26

CONCLUSION .................................................................................................. 27

## TABLE OF AUTHORITIES

**Page**

# Cases

*Aagard v. Palomar Builders, Inc.*,
    344 F. Supp. 2d 1211 (E.D.Cal. 2004) .................................................. 24

*Abe's Rooms, Inc. v. Space Hunters, Inc.*,
    2007 WL 853201 (2 Dep't March 20, 2007) ........................................... 22

*Artco, Inc. v. Kiddie, Inc.*,
    1993 WL 962596 (S.D.N.Y. Dec. 28, 1993) ........................................... 17

*Berwick v. New World Network Int'l, Ltd.*,
    2007 WL 949767 (S.D.N.Y. Mar. 27, 2007) ........................................... 21

*Bieg v. Hovnanian Enterprises, Inc.*,
    157 F. Supp. 2d 475 (E.D. Pa. 2001) ............................................. 13, 14

*Bijan Designer for Men, Inc. v. Katzman*,
    1997 WL 65717 (S.D.N.Y. Feb 7, 1997) ................................................ 20

*Blaustein v. Lazar Borck & Mesch*,
    161 A.D.2d 507, 555 N.Y.S.2d 776 (1st Dep't 1990) ............................... 16

*Brodsky v. Stadlen*,
    138 A.D.2d 662, 526 N.Y.S.2d 478 (2d Dep't 1988) ................................ 17

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182, 785 N.Y.S.2d 359 (2004) .............................................. 20

*Clune v. Publishers' Assoc. of New York City*,
    214 F. Supp. 520 (S.D.N.Y. 1963) ................................................. 8, 25

*Collagenex Pharmaceuticals, Inc. v. Ivax Corp.*,
    375 F. Supp. 2d. 120 (E.D.N.Y. 2005) ................................................. 8

*Computech Int'l, Inc. v. Compaq Computer Corp.*,
    2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002) ........................................ 24

*Dastar v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003) ..................................................................... 23

*Davis v. Trojer*,
    2001 WL 829872 (S.D.N.Y July 20, 2001) ............................................ 22

i

**Page**

*Drug Research Corp. v. Curtis Pub. Co.,*
7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960) ...................................................................... 24

*Effects Associates, Inc. v. Cohen,*
908 F.2d 555 (9th Cir. 1990) .................................................................................... 12

*Estate of John Lennon v. Screen Creations, Ltd.*
939 F. Supp. 287 (S.D.N.Y. 1996) ............................................................................. 9

*Federal Express Corp. v. Federal Espresso, Inc.,*
201 F.3d 168 (2d Cir. 2000) ...................................................................................... 8

*Forest City Daly Housing, Inc. v. Town of North Hempstead,*
175 F.3d 144 (2d Cir. 1999) ...................................................................................... 9

*Gilleland v. Schanhals,*
2001 U.S. Dist. LEXIS 7016 (D. Mich. 2001) .......................................................... 12

*Imperial Residential Design, Inc. v. The Palms Development Group, Inc.,*
70 F.3d 96 (11th Cir. 1995) ...................................................................................... 11

*Kahn v. Kahn,*
3 A.D.2d 820 (1st Dep't 1957) .................................................................................. 15

*Kasada, Inc. v. Access Capital, Inc.,*
2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) .......................................................... 24

*Kidz Cloz, Inc. v. Officially for Kids, Inc.,*
320 F. Supp. 2d 164 (S.D.N.Y. 2004) ................................................... 16, 17, 18, 19

*Konigsberg Intern. Inc. v. Rice,*
16 F.3d 355 (9th Cir. 1994) ...................................................................................... 12

*Margo v. Weiss,*
1998 WL 2558 (S.D.N.Y. Jan. 5, 1998) ................................................................... 15

*Masefield AG v. Colonial Oil Industries,*
2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) ............................................................. 21

*Mayer v. Josiah Wedgwood & Sons, Ltd.,*
601 F. Supp. 1523 (S.D.N.Y. 1985) ......................................................................... 23

*Med. Soc'y of State of New York v. Toia,*
560 F.2d 535 (2d Cir. 1977) ...................................................................................... 7

*Nassau Diagnostic Imaging & Radiation Oncology Assocs. v. Winthrop-Univ. Hosp.,*
197 A.D.2d 563, 602 N.Y.S.2d 650 (N.Y. Sup. Ct. 1993) ....................................... 20

*Nat'l Basketball Assoc. v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997) .......................................................................... 23

*North American Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*,
   2000 WL 1290608 (S.D.N.Y. Sept. 12, 2000) .............................................. 15

*P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*,
   198 F. Supp. 2d 466 (S.D.N.Y. 2002) ...................................................... 19, 20

*Pamfiloff v. Giant Records, Inc.*,
   794 F. Supp. 933 (D. Cal. 1992) ............................................................... 11, 12

*Papa's-June Music v. McLean*,
   921 F. Supp. 1154 (S.D.N.Y. 1996) ........................................................ 12, 13

*Plasmart, Inc. v. Wincell International Inc.*,
   442 F. Supp. 2d 53 (S.D.N.Y. 2006) ....................................................... 19, 20

*Playboy Enterprises v. Dumas*,
   831 F. Supp. 295 (S.D.N.Y. 1993), *rev'd in part on other grounds*,
   53 F.3d 549 (2d Cir. 1995) .......................................................................... 14

*Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America*,
   644 F. Supp. 1327 (S.D.N.Y. 1986) .............................................................. 17

*Rall v. Hellman*,
   284 A.D.2d 113, 726 N.Y.S.2d 629 (1st Dep't 2001) .................................... 24

*Ramirez v. Goldberg*,
   82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981) ...................................... 15

*Rodriguez v. Debuono*,
   175 F.3d 227 (2d Cir. 1998, as amended 1999) ............................................ 25

*Saenger Organization, Inc. v. Durkin*,
   864 F. Supp. 246 (D. Mass. 1994) ................................................................ 11

*Saxon v. Blann*,
   968 F.2d 676 (8th Cir. 1992) ........................................................................ 13

*Snook v. Blank*,
   92 F. Supp. 518 (D. Mont. 1948) .................................................................. 11

*Tasini v. New York Times Co.*,
   972 F. Supp. 804 (S.D.N.Y. 1997) ............................................................... 13

*Teevee Toons, Inc. v. MP3.com, Inc.*,
   134 F. Supp. 2d 546 (S.D.N.Y. 2001) ........................................................... 10

*Tri-Star Pictures v. Unger,*
  14 F. Supp. 2d 339 (S.D.N.Y. 1998) ............................................................... 23

*US Airways Group, Inc. v. British Airways PLC,*
  989 F. Supp. 482 (S.D.N.Y. 1997) ............................................................ 16, 17

*Waste Distillation Technology, Inc v. Blasland & Bouck Engineers, P.C.,*
  136 A.D.2d 633 (2d Dep't 1988) ................................................................... 24

## Other Authorities

1 William F. Patry, Copyright Law & Practice 380-81 n.89 (1994) ............................................. 10

2 William F. Patry, Patry on Copyright § 5:106 (2007) .............................................. 12

Copyright Act, 17 U.S.C. § 204(a) ............................................................. 11

Copyright Act, 17 U.S.C. § 301(a) ............................................................. 22

*Nimmer on Copyright*, Section 10.03 ............................................................. 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

PLAYMORE INC., PUBLISHERS,       :

                                :      Case No.: 07 CV 3057

                  Plaintiff,     :      (LBS)

                                :

           v.                     :

                                :

WALDMAN PUBLISHING CORP.,     :

                                :

                 Defendant.   :

                                :
-------------------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW IN
## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

      Defendant Waldman Publishing Corp. ("Waldman"), by its counsel, respectfully submits

this memorandum of law in opposition to plaintiff Playmore Inc., Publishers' ("Playmore")

motion for a preliminary injunction.

### INTRODUCTION

      Playmore has stepped out of the role of children's book distributor to author and star in

its own epic fiction, casting Waldman as the mustachioed villain whose sole purpose is to bring

economic ruin to the financially fragile, ever-virtuous victim, Playmore.  The self-serving story

Playmore tells is filled with allegations found in melodramatic dime store novels, including

family businesses, conspiracy, betrayal, and strangulation (Affidavit of Jon Horwich, sworn to

April 14, 2007 ("Horwich Aff.") ¶ 54), closing with a climactic "death-blow to the partnership"

(Horwich Aff. ¶ 50).  This Court should not be taken in by Playmore's saga.  In its three

affidavits and 29-page, under-margined brief, Playmore rewrites history, conveniently omits

essential facts, and misstates the law, all in an effort to persuade this Court to gift it a happy ending in the form of an injunction.

Waldman prefers that this Court rule based on the facts and applicable law and, to that end, submits this work of non-fiction in opposition to Playmore's motion for preliminary injunction. Among other reasons that Playmore is not entitled to the extraordinary remedy of injunctive relief is the fact that the present dispute arose entirely from Playmore's own wrongdoing. When the facts become known, this Court will understand that Playmore parlays its factual misrepresentations into a legal fiction, applying the wrong standard for the award of an injunction, and spinning stories of "joint ventures" and "partnerships." There is no basis in fact or law for any of Playmore's claims, and this Court should deny the sought-after injunction in all respects.

Accordingly, Playmore's motion should be denied in its entirety, given that (i) it has not demonstrated irreparable injury absent injunctive relief; (ii) any injury to its business results from its own actions; (iii) it cannot demonstrate likelihood of success on the merits of its claims; (iv) it comes to this Court with unclean hands and thus is not entitled to equitable relief; (v) given its own conduct, the equities do not weigh in its favor; (vi) to the extent that Playmore seeks mandatory injunctive relief (as opposed to prohibitory relief) and to change, rather than maintain, the *status quo ante*, it clearly has not met the extra burden placed upon it as a matter of law; and (vii) Waldman has offered, voluntarily, to resolve the issues raised by Playmore as emergent that has placed it in such a parlous predicament but, as of 2:00 PM on Friday, April 20, 2007, Playmore has rebuffed all such efforts. For these reasons, as further explained below and in the accompanying affidavits, the motion should be denied in all respects.

## STATEMENT OF FACTS

The parties to this very grown-up lawsuit were brought together, rather ironically, by children's books. Waldman creates, designs and publishes books and related items for children (the "Products"). Affidavit of Anne Waldman-Gober, sworn to April 20, 2007 ("Anne Aff.") ¶ 2. Playmore distributes those items to retail customers. Anne Aff. ¶ 9. The two companies are separate corporate entities and maintain complete legal autonomy. They do not share management, bank accounts or employees. Anne Aff. ¶ 5. They do not file partnership tax returns, and have not registered any jointly-owned partnerships or corporations with any governmental entity. *Id.* They have, however, worked closely together for their mutual benefit. Briefly, Waldman is Playmore's sole source for the Product, and Playmore is Waldman's sole distributor. The unwritten and informal financial arrangement between the two companies is a sharing of both expenses and profits. Anne Aff. ¶¶ 4, 9, 11.

Given that Waldman, as publisher, created, designed and ordered the books from the printers, and Playmore distributed the Product and had the relationships with the stores, the two companies shared ideas with regard to which books would sell and which would not. Anne Aff. ¶9. However, all final printing decisions were made by Waldman. Waldman also was solely at risk financially to third parties, such as printers, authors and illustrators, and was the sole tenant on the Ludlow, Massachusetts warehouse lease where the Product was stored (the "Waldman Warehouse"). Anne Aff. ¶ 7. Playmore was responsible for billing and collecting accounts receivables from the customers, and to pay Waldman out of those proceeds. Anne Aff. ¶11. Given Playmore's total control over the receivables from its customers, and the fact that Playmore retains sole custody and control over the accounts receivables, Waldman was, and remains, completely at Playmore's mercy for its own economic viability. Anne Aff. ¶9.

3

When the respective founders of the two companies, Israel Waldman and Robert Horwich, were alive, the relationship was harmonious.  In the absence of any written contract, the relationship between the parties necessarily was based on mutual trust.  In another ironic twist, this fairy tale relationship between children's book publisher and distributor fell apart because of Robert's child and successor, Jon Horwich ("Jon").  Unlike his father, Jon decided to operate Playmore under a shroud of secrecy, and refused to provide Waldman with crucial financial information. Anne Aff. ¶¶ 8, 13, 14, 16, Affidavit of Michael Gober, sworn to April 20, 2007 ("Michael Aff.") ¶ 4.  When Waldman finally insisted on reasonable controls common to all business relationships, Playmore hatched a scheme by which it tricked Waldman into shipping goods for which Playmore had no intention to pay.  In this regard, and as fully explained below and in the accompanying supporting documents, Playmore precipitously initiated this suit in order to justify its failure to pay what it owes Waldman, bringing Waldman to the brink of financial ruin.  Michael Aff. ¶ 23, 24.

As stated above, Waldman receives certain proceeds from Playmore on a monthly basis. These payments principally consist of the total cost of the book charged to Waldman by the printer, plus 50% of the profits on sales.  These payments always have been made on the 15th of each month.  Anne Aff. ¶ 11.

Wading through the miasma of Playmore's vague pleadings, it appears, at least for the purposes of this motion, that Playmore claims that Waldman is putting it out of business by its refusal to deliver the Products to Playmore's customers, and because it has informed printers and others in the trade that Waldman solely owns the copyright to the Products.  Perhaps in its hasty preparation of its emergency 29-page memorandum of law and three affidavits and assembly of 300+ pages of exhibits, Playmore somehow forgot to inform this Court that Waldman did not

actually stop shipping the Product until April 16, 2007, and then only because Playmore did not

pay the $852,276.52 that it owed Waldman on that date. Michael Aff. ¶ 23. Indeed, Playmore's

motion papers, obviously prepared over some weeks, were filed on the *very day* payment was

due. Thus, while Waldman continued to ship Product throughout the months of March and

April, based on Playmore's indication that it would pay as usual, Playmore was busy planning

how it was going to stiff Waldman out of close to $1 million. Michael Aff. ¶¶ 22-24.

    To put this more concretely, Playmore owes Waldman $852,276.52 for sales during

March. Playmore hides from this Court that while it seeks to force Waldman to ship, <u>it has not</u>

<u>paid for product Waldman already delivered!  This, despite Playmore's commitment that it</u>

<u>would pay as usual, upon which Waldman relied when it continued to ship product to Playmore</u>!

Michael Aff. ¶ 24.

    Given that Playmore informed Waldman that it would not pay for Product, thereby

shattering the status quo (as Playmore concedes, these monthly payments have been a staple of

the relationship for decades), it is mind-boggling how Playmore has the gall to ask this Court to

force Waldman nevertheless to continue shipping.

    In this light, Waldman, not Playmore, is the company at risk of financial ruin. It cannot

be emphasized strongly enough that until Monday, April 16th, Waldman was shipping to

Playmore's customers. Michael Aff. ¶¶ 23, 25. Even after this lawsuit and motion were filed on

April 15th, Waldman resolve the matters raised by the injunction. Affidavit of Stephen Wagner,

sworn to April 20, 2007 ("Wagner Aff.") ¶ 4. Playmore has responded to the offer.

    This motion is particularly disingenuous considering its timing. As Playmore noted, the

Waldman Warehouse closed for inventory from March 17 until March 28. During that ten-day

time period, no shipments were made. Affidavit of Jon Horwich, sworn to April 14, 2007

("Horwich Aff.") ¶ 50. The duration of the inventory was exacerbated by Playmore's shutdown of the AS400 computer system. During that entire time, when not one shipment emanated from the Waldman warehouse, Playmore did not come running to this Court seeking injunctive relief. Immediately after completion of inventory, on March 29, 2007, Waldman resumed shipping. On April 16th, while Waldman was shipping, Playmore sued for injunctive relief. It defies logic that Playmore sued while shipments are ongoing, claiming devastating consequences, when for ten days during the inventory no shipments were made and no motion was brought. If its financial ruin was guaranteed, and if non-shipment would "damage[e] Playmore's relationships with customers and its goodwill on an <u>hourly</u> basis" (Affidavit of Richard Cohen, sworn to April 16, 2007 ("Cohen Aff") ¶ 18 (emphasis added)), as Playmore now claims, why it did not sue during a period of non-shipment, and did sue during a period when shipments are being made, is unfathomable.

Moreover, as explained more fully below, Playmore has offered not one piece of evidence demonstrating the purported imminent harm. Despite a 29-page brief spilling over into the margins, it failed to identify a single customer who is waiting for shipment, the percentage of business that such customers represent, indications that customers have abandoned Playmore, or the like. Playmore's self-serving and conclusory allegations of "imminent harm," the <u>sine qua non</u> of a motion for preliminary relief, without more, simply are not enough for such extraordinary relief to be granted.

Further, as set forth at length below, Playmore has not, and cannot, demonstrate a likelihood of success on the merits of any of its claims. The gravamen of Playmore's claims is that it owns 50% of the copyrights. This is not true as a matter of law and fact, as shown below.

Moreover, there was no partnership relationship created between the parties, and therefore no fiduciary duty exists.

Playmore claims that it is entitled to have Product shipped because it is a joint copyright holder. Horwich Aff. ¶ 37-46. Although ownership of the numerous copyrights in question is much in dispute and not relevant to the motion for preliminary relief, even if Playmore were correct (it is not), that would only give Playmore the right to reproduce and distribute the Products. It would not give Playmore ownership over the particular copies of the Product sitting in the Waldman Warehouse, for which Waldman is responsible to pay the printers, authors, and illustrators. Thus, for the purposes of Playmore's motion requiring Waldman to ship, Playmore's claim of ownership interest in thousands of Waldman's copyrights is both incorrect and irrelevant.

The bottom line on this motion for injunctive relief is that Playmore caused the problem it now blames on Waldman. To remedy a potential disaster of its own making, it seeks injunctive relief of both a mandatory and prohibitive nature. It has not come close to meeting its burden, and, accordingly, its motion must be denied.

## ARGUMENT

**I.     Playmore Seeks a Mandatory Injunction, But Fails
        to Satisfy the Stringent Burden of Proof to Obtain One**

It is black letter law that a preliminary injunction is "an extraordinary remedy which should not be routinely granted." *Med. Soc'y of State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977). It is granted only if the movant demonstrates "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000).  Where, as here, Playmore attempts not to preserve the status quo, but to change it by requiring Waldman to ship without paying Waldman, Playmore is subject to a significantly higher burden.

Playmore does not ask this Court to enforce the business arrangement that existed for decades – it wants this Court to issue injunctive relief that would give it a *far better* deal than it had before the dispute between the parties began a month ago.  Playmore, in essence, wants this Court to order Waldman to ship Product to Playmore's customers for free, at Waldman's sole expense.

Playmore does not even come close to satisfying its burden in this regard.  A party seeking an injunction that alters the status quo must meet a very high standard:

> It is elementary that a preliminary injunction is designed to preserve the subject in controversy in its then-existing condition.  It is also equally well known that courts are more reluctant to grant a mandatory injunction than a prohibitory one and that generally an injunction will not lie except in prohibitory form.  <u>Such mandatory injunctions, however, are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.</u>

*Clune v. Publishers' Assoc. of New York City*, 214 F. Supp. 520, 531 (S.D.N.Y. 1963) (holding that plaintiff failed to meet higher pleading requirements for mandatory injunction) (emphasis added).

Because Playmore seeks to materially alter the status quo by obtaining Products without paying, it is subject to the heightened burden of proof required for a mandatory injunction.  It is not enough to show merely a reasonable likelihood of success on the merits.  *Collagenex Pharmaceuticals, Inc. v. Ivax Corp.*, 375 F. Supp. 2d. 120, 134-135 (E.D.N.Y. 2005).  Playmore must establish "<u>a clear or substantial showing of likelihood of success</u>." *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 149-150 (2d Cir. 1999).  Playmore has

altogether failed to meet even the lower standard for a prohibitory injunction, let alone the higher standard for mandatory injunction.

Moreover, Playmore, in seeking to obtain in this motion a declaration that it owns 50% of the copyrights in what Playmore characterizes as thousands of Waldman works created over decades, is seeking to obtain the ultimate relief in the lawsuit. In the first place, seeking such relief is wildly improper on an injunction motion. Beyond that, Playmore has not demonstrated that it will suffer any harm should it not immediately be granted such a declaration.

Finally, as noted above, Waldman was shipping Products to Playmore until Playmore told Waldman it would not pay the $852,276.52 that had been due on April 16th. Thus, it was Playmore that altered the status quo by improperly refusing to pay what it owed Waldman. It is well settled that "injunctions … are an equitable remedy," and parties can be "precluded from equitable relief under the doctrine of unclean hands." *Estate of John Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287 (S.D.N.Y. 1996). The Court in *John Lennon* held that "a court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving … bad faith related to the matter at issue to the detriment of the other party." *Id.*

Here, Playmore brought the halt in shipping on itself after it reneged on its commitment to pay on April 16th. It acted in bad faith to Waldman's detriment, and therefore is precluded from obtaining injunctive relief.

### A.    Playmore Will Not Succeed on the Merits of Its Declaratory Judgment Claims

Playmore's request for a blanket declaration that it is a joint owner of thousands of unspecified Waldman works must be denied. It is undisputed that Waldman is the copyright owner of hundreds of the works to which Playmore lays claim by way of written agreements

providing that the works are works made for hire owned by Waldman alone.  Anne Aff. Ex. 5.

These agreements contain, as is "typical" of such agreements, "'belt and suspenders' language

transferring copyright in the event a work is found not [to] be a work made for hire."  1 William

F. Patry, Copyright Law & Practice 380-81 n.89 (1994).  Waldman's copyright ownership is not

open to question; such agreements have universally been found to vest ownership of the

copyright in the named work-for-hire author/transferee.  *See, e.g., Teevee Toons, Inc. v.*

*MP3.com, Inc.*, 134 F. Supp. 2d 546, 549 (S.D.N.Y. 2001) ("[P]laintiffs' ultimate ownership of

the underlying copyrights in issue is not in doubt, for the agreements provide that total and

complete ownership passes to the plaintiffs, either as works made for hire or, if such status is

denied, by assignment").

 As to such works, the only way that Playmore could be held to jointly own the copyrights

would be if Waldman transferred a share of its copyright interests to Playmore.  Playmore hangs

its entire Section 204(a) transfer claim on a recently surfaced, untitled one-paragraph 1985

document which Playmore in its papers refers to as "the Joint Copyright Agreement," but which

bears no such title, and evidences no such intent.  Putting aside Playmore's failure to supply the

document to Waldman in the month preceding the litigation (despite being asked), Playmore's

rather convenient submission of the document as part of its motion papers, and questions of

authenticity, Anne Aff. ¶¶ 19-20, Affidavit of Richard E. Miller, Esq., sworn to April 19, 2007

("Miller Aff.") ¶ 3-6, Affidavit of Laurence Tauber, sworn to April 20, 2007 ("Tauber Aff.") ¶¶

4, 5, 7, 8 Exs. 2, 4.  Playmore's 1985 document nevertheless utterly fails to satisfy the

requirement of Section 204(a) of the Copyright Act, 17 U.S.C. § 204(a).  Section 204(a) provides

that "a transfer of copyright ownership, other than by operation of law, is not valid unless an

instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by

the owner of the rights conveyed or such owner's duly authorized agent." The writing requirement has been a cornerstone of copyright law for almost 100 years, and the Copyright Act was amended in 1976 to demand even greater certainty than its 1909 predecessor. *See, e.g., Snook v. Blank*, 92 F. Supp. 518 (D. Mont. 1948) (holding that the decedent had not transferred movie rights in his book to the defendant, because the defendant "ha[d] produced no writing to show her alleged gift," as required); *Saenger Organization, Inc. v. Durkin*, 864 F. Supp. 246, 250 (D. Mass. 1994) ("Congress expressly revised the Copyright Act in order to require a written transfer of ownership in order to assure predictability and certainty of ownership"); *Nimmer on Copyright*, Section 10.03 ("The current Act's broadening of 'transfers' to include 'exclusive licenses' thus increases the breadth of conveyances subject to the writing requirement.").

The "chief purpose" of Section 204(a)'s writing requirement, "(like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Imperial Residential Design, Inc. v. The Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995). However, "the provisions of Section 204(a) appear to do more than transfer a general statute of frauds to copyright. Instead, they provide the requirements for the very validity of a given transfer." *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (D. Cal. 1992).

By requiring a signed writing, Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (citation omitted). Section 204's writing requirement not only protects authors, including work-for-hire authors, from fraudulent claims, but also "enhances predictability and certainty of ownership –

'Congress's paramount goal' when it revised the Act in 1976." *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994).

The only exemption from Section 204's writing requirement is for transfers of copyright that occur by operation of law. Section 204 does *not* contain language exempting copyright transfers between joint authors or joint owners; and the signed writing requirement of Section 204(a) applies to transfers between such parties as well as to transfers by authors to third parties. *Papa's-June Music v. McLean*, 921 F. Supp. 1154, 1158 (S.D.N.Y. 1996); *Gilleland v. Schanhals*, 2001 U.S. Dist. LEXIS 7016 (D. Mich. 2001).

Section 204(a)'s writing requirement is so stringent that equitable defenses, such as equitable estoppel, have no application. *See, e.g., Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. at 937 ("Plaintiffs are unable to locate a single case in which a court allowed the doctrine of equitable estoppel to be used to circumvent the writing requirement of Section 204(a)"). Nor can an exemption, and a transfer of copyright ownership, be found based on "custom and practice in the industry." *Effects Associates*, 908 F.2d at 558. *See, e.g.,* 2 William F. Patry, Patry on Copyright § 5:106 (2007) ("Failure to comply with Section 204(a) invalidates the agreement, without regard to any state law or equitable principles to the contrary, without regard to whether the Parties perform under the 'Contract,' and regardless of whether the putative transferor has agreed orally or otherwise in a noncontract that an agreement is in force").

To be valid, a Section 204(a) writing need not be lengthy or detailed. "It doesn't have to be the Magna Carta; a one-line pro forma statement will do." *Effects Associates*, 908 F.2d at 557. However, "the terms of any writing purporting to transfer copyright interests, even a one-line pro forma statement, must be clear," *Papa's June Music*, 921 F. Supp. at 1158-1159; *Bieg v. Hovnanian Enters., Inc.*, 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001); *Tasini v. New York Times*

*Co.*, 972 F. Supp. 804, 810 (S.D.N.Y. 1997), and it must clearly and unambiguously reflect the copyright owner's intent to effect a transfer of copyright ownership, *see Papa's-June Music*, 921 F. Supp. at 1159. Simply put, "[t]o transfer ownership of a copyright, the parties must state in writing that they intend to transfer a copyright." *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992).

The 1985 document, and the circumstances of its production, are sorely lacking in indicia of reliability. Herschel Waldman, the purported signer of the 1985 document on behalf of Waldman, categorically did not have the power to convey a one-half interest in Waldman's most significant asset, its copyrights, to Playmore or to anyone else. Anne Aff. ¶ 19; Miller Aff. ¶ 3-6. Herschel Waldman's lack of capacity to make such a conveyance on behalf of Waldman was known to Playmore, *id.*, precluding any claim that Playmore relied on apparent authority. Anne Aff. ¶ 19. In any case, the 1985 document falls far short of being sufficiently clear to unambiguously transfer a 50% copyright interest in all then-existing works—as well as all subsequently-created works—of Waldman, as Playmore claims. The requisite intent to effect a transfer (or to memorialize a prior oral transfer) to Playmore of any then-subsisting rights is nowhere apparent. The language defining the works as to which Playmore claims copyright rights were transferred is hopelessly vague: "published works where Waldman Publishing and Playmore, Inc., Publishers, are both *indicated* as being the copyright owners of the works." (Emphasis added.) There is no hint in the language of the 1985 document as to what that ambiguous "indicated" means, and there is absolutely nothing that even colorably suggests that the 1985 document is intended to effect a transfer of rights in works to be created subsequently by (or for) Waldman.

On its face, Playmore's 1985 document is not an instrument of conveyance at all; instead it merely purports to "acknowledge" that the parties "have previously entered into an agreement." However, there is no proof that such an agreement exists; nor is there proof of its terms. There is not even parol evidence before the Court. The absence of proof is fatal to Playmore's claim. The court in *Playboy Enterprises v. Dumas*, 831 F. Supp. 295, 308 (S.D.N.Y. 1993), *rev'd in part on other grounds*, 53 F.3d 549 (2d Cir. 1995), found that the asserted Section 204 writing before it likewise did not describe a present transfer; but instead purported to confirm a previous transfer of rights. 831 F. Supp. at 309. However, like Playmore here, the plaintiff "introduced no credible evidence as to any existing prior agreement." *Id.* at 305. Thus there was "no clear way to tell what the parties intended by their agreement." *Id.* at 308-309. Accordingly, the court concluded, "given the lack of evidence surrounding the agreements said to underlie … [the claimed Section 204(a) writing, it] was insufficient, by itself, to transfer copyright ownership in any of the … works." *Id.* at 309. Playmore's 1985 document, without any evidence whatever of the "previous agreement" it purports to "acknowledge," is similarly insufficient.

Where, as here, the language of the writing claimed to evidence a transfer is ambiguous or unclear, resort may be had to extrinsic evidence to determine the parties' intent. *Dumas*, 831 F. Supp. at 308-09; *Bieg v. Hovnanian Enterprises., Inc.*, 157 F. Supp. 2d 475, 480 (D. Pa. 2001) ("any ambiguity concerning the alleged transfer must be interpreted in favor of the original copyright holder in order to satisfy the purpose of Section 204(a)."). The question of the parties' intent in the 1985 document at the very least creates a substantial factual dispute that cannot be resolved without discovery—and certainly cannot be summarily resolved in Playmore's favor as to each of the literally hundreds of works as to which Playmore seeks a blanket declaration of

joint copyright ownership.  These disputed factual issues are especially inappropriate to resolve

in the context of the drastic and extraordinary preliminary relief Playmore seeks.

**B.**    **Plaintiff Will Not Succeed on the Merits**
          **of its Breach of Fiduciary Duty Claims**

Playmore will not -- and cannot -- succeed on its breach of fiduciary duty claim.

Playmore's sole basis for alleging the existence of a fiduciary duty between the parties is their

conclusory allegation that Playmore and Waldman were "partners" or "joint venturers."

**i.  The Parties Were Neither Partners Nor Joint Venturers**

New York law is very clear that the party claiming the existence of a partnership or joint

venture bears the burden of proving its existence by a fair preponderance of the evidence.  *See*

*Ramirez v. Goldberg*, 82 A.D.2d 850, 439 N.Y.S.2d 959 (2d Dep't 1981); *Kahn v. Kahn*, 3

A.D.2d 820 (1st Dep't 1957) (refusing to find oral partnership agreement where proof was evenly

divided); *North American Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 2000 WL 1290608,

*1 (S.D.N.Y. Sept. 12, 2000).

Playmore's memorandum casually assumes, without any legal basis, that co-ownership of

a copyright not only entitles one owner to force the other into an exclusive distribution

arrangement, but also creates a fiduciary relationship between the owners.  Playmore's

assumption grossly misstates the law.  Co-owners of a copyright have no fiduciary obligations to

one another.  As the Court in *Margo v. Weiss*, 1998 WL 2558, *9 (S.D.N.Y. Jan. 5, 1998), held;

> Assuming *arguendo* that plaintiffs' claims for breach of fiduciary duty are not …
> otherwise precluded, they are premised on the unsupported assumption that co-authors
> owe fiduciary duties to one another.  Plaintiffs cite no authority for this proposition and
> [the court] has found none.  On the contrary, it appears that, with limited exceptions not
> applicable here, the only duty that exists between co-authors is the duty to account for
> profits. …  However, the duty to account for profits presupposes a relationship as co-
> owners of the copyright […].

Thus, even if Playmore were correct that the parties co-own the copyrights (it is not correct), no fiduciary duty would be thereby established. To prove the existence of a partnership absent a partnership agreement, the plaintiff must establish "(1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004). To establish a joint venture, the plaintiff must prove that "(1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for the sharing of both losses and profits." *Kidz Cloz*, 320 F. Supp. 2d at 171 (citations and internal quotations omitted).

The heart of Playmore's argument concerning the existence of a purported partnership is the alleged co-ownership of certain unnamed copyrights and sharing profits. As shown above, as co-ownership of copyrights does not create any fiduciary relationship, it does not create a partnership. Moreover, "*all* of the elements of the relationship must be considered," *Blaustein v. Lazar Borck & Mesch*, 161 A.D.2d 507, 555 N.Y.S.2d 776 (1st Dep't 1990), as "the absence of any one element is fatal to the establishment of a joint venture." *US Airways Group, Inc. v. British Airways PLC*, 989 F. Supp. 482, 493 (S.D.N.Y. 1997). It is beyond question that both Playmore and Waldman are independent companies, each with its own management, and each operating its own business independently of the other.

Moreover, the parties, both sophisticated and represented by counsel at all relevant times, could have drafted even a simple partnership agreement, registered it with the State of New

York, and filed taxes on its behalf, as they would have been required to do. Indeed, as described in the Horwich Affidavit, in 1975 the parties did form a business venture together – Prestige Books – but in 1982 the company was terminated and its assets liquidated. Horwich Aff. ¶ 35. Obviously, the parties knew how to enter into a partnership arrangement.

They did not do so here. No joint venture was formed. "A joint venture is a voluntary relationship arising out of contract; it is not a status created by law. … Entry into a series of cooperative agreements does not manifest an intent to enter a joint venture. … The failure to plead intent is fatal." *US Airways*, 989 F. Supp. at 493 (S.D.N.Y. 1997). [The] "parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract." *Precision Testing Laboratories, Ltd. v. Kenyon Corp. of America*, 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986). No evidence has been presented exhibiting such an intent.

Notwithstanding Playmore's attempts to summarily call the parties' business arrangement a "partnership" or "joint venture," New York law is clear that "calling an organization a partnership does not make it one." *Kidz Cloz*, 320 F. Supp. 2d at 171 (refusing to find partnership where, *inter alia*, "for over 13 years the parties represented that [plaintiff] was a partner in the business") (citations and internal quotations omitted); *see also Brodsky v. Stadlen*, 138 A.D.2d 662, 663, 526 N.Y.S.2d 478, 480 (2d Dep't 1988) (refusing to find partnership even though certain documents referred to the company at issue as a partnership, because defendants indicated no intention to allow joint management and control with plaintiff); *Artco, Inc. v. Kiddie, Inc.*, 1993 WL 962596 (S.D.N.Y. Dec. 28, 1993). Like the parties in the *Kidz Cloz* case, here, the business arrangement was "at best, a joint venture between two separate companies that agreed to work together for their mutual benefit, namely, to better market themselves to the trade." 320 F. Supp. 2d at 175-176.

Playmore's only allegation of the existence of "partnership assets" includes (1) the copyrights and (2) the books in the Waldman Warehouse. As addressed above, co-ownership of a copyright does not create a fiduciary relationship, and ownership of the copyright does not mean ownership of the Product. There was no partnership or joint venture here, and no fiduciary duties owed.

### ii. **Even If A Partnership Existed, Playmore's Fiduciary Claim Still Fails**

Even if, as Playmore alleges, the parties were partners and owed each other a fiduciary duty -- which is not the case -- Playmore's failure to provide an accounting of the proceeds from the March 2007 book sales would have been a superseding breach of fiduciary duty.

Playmore concedes that there was no written partnership or joint venture agreement. Pl. Mem. p. 22. While the purported oral agreement would not be barred by the Statute of Frauds, "such an agreement, however, is terminable at will. ... New York law is clear that a venture at will can be terminated without liability for a breach of contract by any partner at any time by any act which evidences intent to terminate the association." *Kidz Cloz*, 320 F. Supp. 2d at 172 (citations and internal quotations omitted). Playmore's refusal to account for the profits it obtained from book sales during March 2007, together with its refusal to pay for the books it now demands be shipped, amounts to an intention to terminate the purported "joint venture" or "partnership."

Upon "dissolution of a partnership at will, a partner's only remedy is an accounting," not a claim for breach of fiduciary duty. *Kidz Cloz*, 320 F. Supp. 2d at 176 (holding that even if plaintiff had properly alleged a partnership and a corresponding fiduciary duty, there could be no breach of fiduciary duty upon dissolution) (citations and internal quotations omitted). Like the alleged partnership in *Kidz Cloz*, here there are absolutely no "partnership assets," and therefore

18

nothing to "wind down" as part of the termination of the alleged partnership because Waldman has the sole and exclusive title to the books in the Waldman Warehouse.

**C.   Playmore has No Likelihood of Success on the Merits of its Claim for Tortious Interference with Prospective Contractual Relations**

Under New York law, a claim for tortious interference with prospective contractual or business relations requires that (1) the plaintiff had a business relationship with a third party; (2) defendant knew of and intentionally interfered with that relationship; (3) defendant acted solely out of malice, or used dishonest, unfair, improper or wrongful means; and (4) the interference in fact injured the relationship. *Plasmart, Inc. v. Wincell International Inc.,* 442 F. Supp. 2d 53, 56 (S.D.N.Y. 2006) (denied injunctive relief on claim for tortious interference with prospective business where claimant failed to overcome presumption that defendant's assertions of patent infringement were made in good faith); *see also P. Kaufmann, Inc. v. Americraft Fabrics, Inc.,* 198 F. Supp. 2d 466, 473 (S.D.N.Y. 2002) (denied counterclaim seeking injunctive relief for tortious interference with prospective economic advantage because counterclaimant's allegation that plaintiff competitor made a false statement in two letters to counterclaimant's retailers informing them of counterclaimant's infringement of plaintiff's copyrights did not amount to "wrongful means").

Playmore will not succeed on the merits of its claim for several reasons. First, it had no independent relationship with the printers with whom Waldman allegedly interfered. The relationship was between Waldman and the printer, as Waldman was the only party obligated to pay the printer. Second, a claim for tortious interference with "prospective" contractual relations will not lie absent a clear showing that the action complained of was motivated *solely* by malice or a desire to inflict injury by unlawful means rather than by self-interest or other economic considerations. *Bijan Designer for Men, Inc. v. Katzman*, 1997 WL 65717 at *9 (S.D.N.Y. Feb

19

7, 1997) (denying plaintiff's claim for injunctive relief for, among other reasons, failure to establish that interference was motivated solely by malice).  The general rule is that the conduct must amount to a crime or an independent tort, and that "conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359 (2004).

Playmore's allegations are not sufficient.  Simply put, Playmore fails to cite any facts that malice was Waldman's sole motivation in requiring that its printers not ship Product without Waldman's authorization or that the printers work exclusively with Waldman.  At best, all that Playmore could show is that Waldman acted out of its own economic self-interest.  *Nassau Diagnostic Imaging & Radiation Oncology Assocs. v. Winthrop-Univ. Hosp.*, 197 A.D.2d 563, 564, 602 N.Y.S.2d 650, 651 (N.Y. Sup. Ct. 1993) (actions motivated in part by economic self-interest could not be characterized as malicious and thus plaintiffs could not recover in absence of showing that means employed by defendants were improper or unlawful).

The "interfering" actions alleged by Playmore, if anything, only evidence Waldman's good faith desire to enforce its intellectual property rights.  *Plasmart,* 442 F. Supp. 2d at 53; *P. Kaufmann*, 198 F. Supp. 2d at 473.  The facts on this point are indisputable.  Attached to the Anne Affidavit as Exhibit 5 are but a sampling of the assignments of the copyright by the authors to Waldman.  Playmore is not an assignee of those copyrights.  Waldman had been informed by counsel that it owned the copyrights.  Michael Aff. Ex. 9.  Moreover, Waldman was not aware of the existence of the 1985 document.  When informed by Playmore's counsel of its existence, Waldman's counsel asked to see it.  Playmore's counsel refused to fax over a piece of paper consisting of one paragraph.  Tauber Aff. ¶ 5, 9.  Under those circumstances, in the absence of

any evidence to the contrary, Waldman was within its rights to inform its printers that it owned 100% of the copyright associated with the Works. As shown above, even the existence of the 1985 document does not in any way grant ownership rights in the copyrights to Playmore. Waldman wanted to protect itself, as it was the only party at risk to the printers. All of these reasons show that Waldman acted for its own economic interest, and not maliciously against Playmore. In fact, Waldman's rebuffed offer to remain silent on copyright ownership pending resolution of this case belies any malicious intent on Waldman's part.

Finally, Playmore fails to cite a single case in which the plaintiff was successful on the merits with regard to its claim for tortious interference with prospective business or contractual relations. Rather, both cases cited by Playmore resulted in dismissals of the plaintiffs' claims. *Berwick v. New World Network Int'l, Ltd.,* 2007 WL 949767 at *14 (S.D.N.Y. Mar. 27, 2007) (dismissed claim for tortious interference with prospective contractual relations on the grounds defendant could not have acted solely out of malice where the parties were competitors and the alleged false statements did not constitute "wrongful means"); *Masefield AG v. Colonial Oil Industries,* 2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) (dismissed claim for tortious interference with business relations on grounds defendant's actions were not motivated solely by malice, but rather by the desire for profit).

### D.    Playmore Will Not Succeed on its Unfair Competition Claim

As to the second cause of action alleging common-law unfair competition, to sustain such a claim, Playmore must show that the defendants misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so. *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 2007 WL 853201, *2 (2 Dep't March 20, 2007).

Insofar as Plaintiff purports to state a claim for "misappropriation" based on Defendant's "develop[ing], produc[ing] and market[ing] the intellectual property and the works," Complaint ¶¶ 74-82, such claim is preempted by the Copyright Act.  17 U.S.C. § 301(a). *See also Davis v. Trojer*, 2001 WL 829872, *3 (S.D.N.Y July 20, 2001) ("when a state law claims of unfair competition is premised upon an allegation of misappropriation… such a claim is preempted by the federal copyright law").

A state common law or statutory claim is preempted if:

> (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act … and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law.

*Briarpatch Ltd. v. Phoenix Pictures*, 373 F.3d 296, 305 (2d Cir. 2004). "The first prong of this test is called the 'subject matter requirement' and the second prong is called the 'general scope requirement.'" *Id.*  The Products clearly meet the subject matter requirement.

Under the general scope requirement, a claim is preempted when "the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law;" a state law claim involving "acts of reproduction, adaptation, performance, distribution or display" meets the general scope requirement. *Id.*; 17 U.S.C. § 106 (delineating exclusive rights under the Copyright Act).

While a state law claim that alleges an "extra element" that makes it "qualitatively different from a copyright infringement claim may not be preempted," *Briarpatch*, 373 F.3d at 305-06, courts have taken "a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Id.* at 306. Plaintiff's state law claim for "develop[ing], produc[ing] and market[ing] the intellectual property and the works" falls within the scope of the exclusive reproduction and distribution rights under 17 U.S.C. § 106. Characterizing those acts as "misappropriation," "immoral trade practices" or the like is not an "extra element"; doing so "alters the scope of the action but not its nature .... The basic act which constitutes the infringement of plaintiff's rights ... is the same as that of copyright." *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1525 (S.D.N.Y. 1985). Accordingly,

> broad misappropriation doctrine based on amorphous concepts such as "commercial immorality" or society's "ethics" is preempted. Such concepts are virtually synonymous for wrongful copying and are in no meaningful fashion distinguishable from infringement of a copyright.

*Nat'l Basketball Assoc. v. Motorola, Inc.*, 105 F.3d 841, 851 (2d Cir. 1997). Playmore's "misappropriation" claim is preempted. As such, Playmore cannot win on the merits of this claim.

Playmore's indistinctly stated common law claim for false designation of origin also fails. In *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003), the Supreme Court held that

> the phrase "origin of goods" in the Lanham Act ... refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

Here, Playmore does not allege that Waldman is deceiving anyone regarding the "origin" of the Products. Playmore alleges that Waldman misrepresents the ownership of the copyrights.

Complaint ¶¶ 74-82. The standards for such "reverse passing off" claims under the Lanham Act and New York law "are almost indistinguishable." *Tri-Star Pictures v. Unger*, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998). Accordingly, after Dastar "state law claims which rely upon reverse palming off of communicative products also conflict with – and are, therefore, preempted by – federal copyright law." *Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211, 1218 (E.D.Cal. 2004). Plaintiff's unfair competition claim fails as a matter of law.

### E.    Playmore Will Not Succeed on its Trade Libel Claim

Playmore cannot establish that it will succeed on the merits of its claim for trade libel. The elements of a claim of trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; and (iii) malice, designed to prevent others from doing business with the defamed party or otherwise interfering with its business relationships. *Kasada, Inc. v. Access Capital, Inc.*, 2004 WL 2903776, *16 (S.D.N.Y. Dec. 14, 2004); *Waste Distillation Technology, Inc v. Blasland & Bouck Engineers, P.C.*, 136 A.D.2d 633 (2d Dep't. 1988). Additionally, the party alleging trade libel must establish special damages. *Kasada,* 2004 WL 2903776 at *16. The requirement of pleading and proving special damages is applied strictly. *Computech Int'l, Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, *5 (S.D.N.Y. Oct. 24, 2002).

Under New York law, a plaintiff's special damages claim, premised, as here, on loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38 (1960) (finding that special damages were not adequately alleged where the damage claim was a round figure [$5,000,000] with no attempt at itemization); *see also Rall v. Hellman*, 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (1st Dep't 2001) (finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Here, Playmore alleges damages "in an amount to be determined at

trial." Complaint ¶ 85. This allegation is insufficient under New York law and, thus, Playmore cannot possibly succeed on the merits of its trade libel claim.

## II. Playmore Will Not Suffer Irreparable Harm

Not only will Playmore not suffer irreparable harm, but Playmore's claim of irreparable harm is materially inconsistent with its argument that it was in a partnership with Waldman. Assuming that the parties were "partners" -- which they were not -- then both Waldman and Playmore would suffer equally if the books were not delivered to Playmore. Instead, Playmore rails that if it "is not permitted to resume delivery of books to its 2000 active customers ... its reputation will be ruined. The future of Playmore, a family owned and operated business since 1942, will be imperiled." Pl. Mem. p. 28 (emphasis added). Playmore does not consider Wal-Mart, BJ's Wholesale Club and CVS Pharmacy to be, in any way, Waldman's customers. Its argument about irreparable harm is centered squarely on Playmore's own goodwill from the book sales.

As to the injunctive relief, Playmore has failed to allege any irreparable harm absent the award of the injunction. As the Second Circuit held:

> [I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. ... Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages. ... In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.

*Rodriguez v. Debuono*, 175 F.3d 227 (2d Cir. 1998, as amended 1999) (citations and internal quotations omitted).

Notwithstanding this rigorous burden of proof, Playmore spends a scant one paragraph in support of its argument that it will suffer irreparable harm. Pl. Mem. p. 28. It provides no information to this Court regarding the customers who have abandoned Playmore, the volume of

business lost, the amount of money damages, or any other facts concerning irreparable harm.

Playmore simply has not proven that it will suffer the kind of "extreme or very serious damage"

that would warrant the issuance of a mandatory injunction. *Clune*, 214 F. Supp. at 531

(S.D.N.Y. 1963).

Moreover, as stated above, Playmore's action, or better, inaction, during the ten-day

inventory, when absolutely no goods were shipped, belies Playmore's irreparable harm claim.

Indeed, Waldman <u>has</u> been shipping consistently since the inventory was finished. If Playmore

can deliver books to its customers, what is the irreparable harm to which Playmore is subject?

### III.    Playmore Has Not Presented Fair Grounds For Litigation, and <u>the Balance of the Hardship Weighs in Waldman's Favor</u>

As already demonstrated, Playmore has failed to demonstrate any basis for liability, and

thus it has failed to present a fair ground for litigation. Playmore also fails to even consider the

potential hardship to Waldman in the event the injunction they seek is granted. If Waldman is

forced to give its books to Playmore without Playmore having paid for them first, Waldman

would suffer a tremendous loss, to the tune of nearly a million dollars per month. The balance of

the equities definitely tilts in Waldman's favor.

## CONCLUSION

For all of the foregoing reasons, Playmore's motion for preliminary injunction should be denied in all respects.

COHEN TAUBER SPIEVACK & WAGNER LLP

By: _____

Stephen Wagner (SW 2900)
Sari Kolatch (SK 3026)
Yamuna Bhaskaran (YB 8650)
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 586-5800
*Attorneys for Defendant*

COWAN, LIEBOWITZ & LATMAN, P.C.
Thomas Kjellberg (TK 0605)
1133 Avenue of the Americas
New York, New York 10036
(212) 790-9200
*Co-Attorneys for Defendant*

27