UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PLAYMORE INC., PUBLISHERS,                  :
                                            :    Case No.: 07 CV 3057
                   Plaintiff,               :    (LBS)
                                            :
           v.                               :    **AFFIDAVIT OF**
                                            :    **MICHAEL GOBER**
WALDMAN PUBLISHING CORP.,                   :
                                            :
                   Defendant.               :
                                            :
------------------------------------------------------------X

STATE OF NEW YORK          )
                             ss:
COUNTY OF NEW YORK         )

Michael Gober, being duly sworn, deposes and says:

1.  I am the Chief Operating Officer ("COO") of Waldman Publishing Corp. ("Waldman"). I have held that position since January, 2007. I have been involved with Waldman in an advisory and consultant capacity, both formal and informal, since 2002. I submit this affidavit based on personal knowledge.

2.  I received an undergraduate degree, magna cum laude, in Finance from the Wharton School of Business, an undergraduate degree in English Literature from the College of Arts & Sciences at the University of Pennsylvania, magna cum laude and Phi Beta Kappa, a Master's degree in International Political Economy from the London School of Economics and Political Science, and a Masters in Business Administration from Stanford University. I was named a Thouron Fellow in 1998. I previously worked for private equity firms, I speak four foreign languages, and, after I graduated Stanford, I began my own business.

1

3.      I joined Waldman full time in January at the urging of my family, including its president, my mother Anne Waldman Gober. At this time, Waldman faced financial uncertainty, and my mother was under extreme stress that had both mental and physical implications. I was tasked with finding the cause and solution to Waldman's deteriorating financial condition before it was too late.

4.      From the outset it is important to note that it was never my intention, nor is it in Waldman's interest, to put Playmore -- or Waldman -- out of business. On the other hand, the business relationship as it currently exists between the companies has crippled Waldman financially. It has become increasingly obvious that this informal, undocumented relationship that may have worked when my grandfather was alive, is no longer viable. There are no documents to evidence the rights and obligations of each of the companies and there is a complete lack of transparency and accountability. Each month Waldman incurs and/or is exposed to millions of dollars of risk and is required to simply take it on faith that Playmore will meet its payment obligations (a faith that now has proven to be misplaced). Moreover, because Playmore has steadfastly refused to share critical financial information with regard to gross profits or provide any back-up or supporting data for its expenses, particularly for its accounts receivables and bad debt, Waldman is unable to verify that Playmore is properly stating its revenues from sales and that Waldman is receiving its fair share. I did not need to attend business school to know that this is a preposterous way to run a multi-million dollar company in this day and age, and Waldman's accountants made clear that the financial viability of the company was at serious risk. That having been said, when I joined Waldman I was more than happy to find a way to make the business relationship between the two companies viable and

profitable, and I approached the situation with a constructive spirit, a willingness to listen, and a desire to help my family.

5.      Since there was no writing memorializing the terms of the business relationship between the companies, one of my initial goals was to talk to Jon Horwich to gain an understanding of the arrangements between our two companies. In or about early February, 2007, I had a telephone conversation with Mr. Horwich in which he specifically described the relationship as a "handshake" agreement. He told me that the two companies worked autonomously; that Playmore's customers knew little or nothing about Waldman, and Waldman's printers, or vendors, knew little or nothing about Playmore. Mr. Horwich also claimed that Playmore owned half the copyright in the Products produced by Waldman, and half of the inventory. When I questioned the accuracy of this assertion, he conceded that Playmore did not own any of the inventory, but still claimed that it had a 50% ownership in the copyrights. Not only did Mr. Horwich make no mention of this 1985 writing that he now grandly refers to as the "1985 Joint Copyright Agreement," but he was unequivocal that there was no written agreement between our two companies.

6.      A prime cause of Waldman's financial woes was attributable to the substantial excess inventory that it carried. If Waldman was to have any chance of becoming a viable business again, it was crucial that it gain control of its inventory.

7.      The AS400 operating system owned and controlled by Playmore, was supposed to contain a record of the inventory existing in Waldman's warehouse. By the end of February of this year I learned that the inventory information in the AS400 did not accurately reflect the large quantity of inventory in the warehouse. (The inaccuracy was later confirmed once Waldman completed a comprehensive physical inventory with the help of an experienced consultant from

the printing and paper industry.) Playmore was pressuring me to place additional orders, but I had no clear idea of how much inventory Waldman was already carrying. Moreover, Horwich refused to supply me with the gross profitability on the orders he wanted me to place, and so, I was put in the untenable position of operating my company with the equivalent of a financial blindfold.

8. To make matters worse for Waldman, pursuant to this informal, undocumented arrangement between the companies, Playmore merely *advised* Waldman to order additional inventory. This created no obligation on Playmore's part to ultimately order the inventory from Waldman and pay for it. Playmore was free to cancel orders at any time - including after it had already provided Waldman with a bill of lading. Thus, Waldman was often in the position of ordering -- and paying for -- product and then getting stuck with that inventory when Playmore did not subsequently order it from Waldman's warehouse, or when it cancelled an existing order.

9. RJB International Ltd. ("RJB") was the broker through which Waldman orders only some of its Products, namely those which Waldman sourced from Asia. Waldman sources an equal if not greater portion of its Products from printers outside of Asia. When I became COO, RJB was pressuring Waldman to provide it with projections for orders for the remainder of the year. Although these were termed "projections," I understood from conversations with RJB and Waldman management that RJB considered them to be the equivalent of a contractual obligation on Waldman's part to subsequently place those orders. I also understood from Waldman employees that RJB might begin printing goods for Waldman based on those projections without receiving formal, confirmed purchase orders from Waldman. For the purposes of these "projections," Waldman therefore had to rely on Playmore - which had the customer relationships - to provide it with appropriate projections. As mentioned, even if it

provided projections, Playmore had no corresponding obligation subsequently to order the Products from Waldman. Thus, the liability, risk and financial burden was borne exclusively by Waldman. Accordingly, this was not a process Waldman could take lightly and I was unwilling to provide RJB with projected orders until Waldman got a handle on its existing inventory and its expected inventory needs.

10.    On March 5, 2007, I had a telephone conversation with Mr. Horwich in which I expressed Waldman's concern about the existing inventory and I advised him that Waldman needed to conduct an inventory as soon as possible. Mr. Horwich disagreed that the inventory report in the AS400 was inaccurate, and told me he saw no reason for Waldman to conduct an inventory. Mr. Horwich repeated his sentiment to me the next day via email. Attached as Exhibit 1 is a true and accurate copy of the March 6, 2007 email I received from Mr. Horwich.

11.    As the sole owner of the inventory, Waldman is the only party with the authority to conduct an inventory, and has complete discretion to determine when to conduct it. Waldman traditionally conducted its inventory in the slow season, usually March and April. Waldman retained the services of an outside operations consultant with experience in the printing and paper industry to assist it in conducting the inventory and improving the accuracy of its results.

12.    RJB and Playmore continued to pressure me to place additional orders, claiming alternatively that we would lose either the printers or the customers and that both Waldman and Playmore would be out of business. Attached as Exhibit 2 is a true and accurate copy of emails I received from Richard Baldassare of RJB and Jon Horwich on March 14, 2007, advising me of the urgent need for Waldman to place additional orders.

13.    On the one hand, Waldman simply could not continue with the old-guard style of business that had served it so well during its early years, especially since I was advised by

Waldman's accountants that profitability and cash flows were deteriorating. On the other hand, we had a long-standing relationship with Playmore and its customers and we were mindful of the fact that Waldman's decision regarding its own future impacted Playmore.

14.    After much agonizing and debate, during the week of March 16, 2007 my family made the difficult decision that it did not want to continue in the publishing business under the current arrangement and that we needed to find a viable exit strategy.

15.    On the afternoon of March 16, 2007, I called Mr. Horwich and informed him of the family's decision. I also informed Mr. Horwich, out of courtesy for the Waldman/Playmore relationship, that Waldman would continue to fill orders for Playmore's customers, provided that the arrangement was formalized and conducted pursuant to reasonable business terms. Waldman needed to insure that Playmore would pay for all Products Waldman ordered from its vendors. I also wanted to know in advance what the gross profit margins were for the orders shipped to Playmore. In the same conversation I told Mr. Horwich that Waldman's attorney, Jerry Cohen of Cohen Tauber Spievack & Wagner LLP, would forward to Playmore a proposal for the terms of the relationship going forward, and that I believed Playmore would find those terms to be reasonable. In the meantime, I informed Mr. Horwich that Waldman's warehouse would be closed for inventory -- as I had previously suggested to him -- and that no further shipments would be made for the time being. Finally, I told Mr. Horwich that I expected the family would put Waldman up for sale.

16.    Immediately after our telephone conversation, I sent Mr. Horwich a follow-up email memorializing the key points of our conversation. Attached as Exhibit 3 is a true and accurate copy of my email dated March 16, 2007.

17. I then sent an email to various parties associated with Waldman's supply chain for Products, including RJB, notifying them that all Waldman orders were being put on hold pending Waldman's completion of its inventory, and that RJB was not to ship any orders unless it received written instruction from me. A copy of my email is attached as Exhibit 4.

18. On Monday, March 19, 2007, Playmore terminated Waldman's access to the AS400. As noted above, the AS400 contained information regarding Waldman's inventory. Accordingly, Waldman could not conduct the inventory without the information contained in the AS400. Playmore's restriction of Waldman's access to the AS400 served to prolong the inventory process.

19. On Wednesday evening, March 21, 2007. Mr. Horwich informed me of his desire to purchase Waldman. We agreed to meet on Friday, March 23, 2007, to discuss Playmore's potential acquisition of Waldman.

20. On Friday, March 23, 2007, I disclosed certain confidential financial information, and information related to the value of Waldman's business, to Mr. Horwich. We discussed a potential transaction, and he asked for additional financial information which I gathered for him over the weekend and provided to him on March 24th. I never heard back from Mr. Horwich regarding Playmore's potential purchase of Waldman.

21. On March 29, 2007 Waldman agreed that it would complete shipments -- under the old terms -- for bills of lading that had been issued prior to March 16, 2007, where Playmore confirmed there was a firm order for the Products from a customer. As indicated above, because Playmore could cancel an order at any time, I was not willing to order new inventory to fill those orders and agreed to ship where stock was available.

22. On March 28, 2007, I sent Mr. Horwich an email with an attached spreadsheet of the orders Waldman would ship. I asked Mr. Horwich then and in subsequent emails to provide me assurance of payment by Playmore to which Mr. Horwich later responded in writing that "[a]s for payment, Playmore has never given any indication from day 1 of these discussions, or for 30+ years for that matter, that payment would not be made." Attached as Exhibit 5 is a true an accurate copy of my March 30th email to Jon Horwich with his embedded responses and attached spreadsheet of orders to be shipped by Waldman.

23. I relied on Playmore's assurance that it would meet its payment obligations, and on that basis instructed the warehouse to ship. Horwich knew that we would continue shipping until payment for the previous month was due on April 16, 2007, and Horwich knew he could extract two additional weeks worth of books essentially for free. Those two weeks gave him ample time to prepare for a litigation that was born the very day the $852,276.52 payment was due. On April 16, Horwich informed me via email that "as of today there is a pending litigation" between Playmore and Waldman and that "we will await a determination of the Court before there is a transfer of monies in either direction." Playmore also removed Waldman's access to the AS400 again, so that Waldman now can no longer determine what it is due from Playmore for shipments made beginning April 1. It need hardly be said that after Horwich told me he no longer would pay for the Products, I instructed the warehouse to cease shipping. Having extracted free shipments from Waldman (March and two weeks in April), Playmore now asks this Court for assistance in perpetuating its scheme to receive Products without paying for them. Attached as Exhibit 6 is a true an accurate copy of the April 16 email.

24. With the benefit of hindsight I now know that while Waldman spent the past two weeks shipping orders for Playmore in good faith, Playmore's lawyers were putting together this

motion for a preliminary injunction which was timed to be filed on the date Playmore's payment was due. This enabled Playmore to squeeze out as many shipments from Waldman as possible <u>for which it never intended to pay</u>.

25. Attached as Exhibit 7 is a true and accurate copy of a list of shipments Waldman completed for Playmore through April 13, 2007 in reliance on Mr. Horwich's assurance that Playmore would meet its payment obligations to Waldman. Many of the shipments that went uncompleted were cancelled or put on hold by Playmore.

26. Waldman currently has outstanding obligations to its own vendors including printers, packaging and freight in the amount of $930,170 that it incurred publishing Products for Playmore. Playmore's refusal to meet its payment obligations makes it impossible for Waldman to meet its own obligations and has placed the company in an extremely precarious situation with little cash available to run its business.

27. On March 30, 2007, I received an email from RJB that obviously was sent to me in error. The email begins "Dear Nichola, Mega" and was emailed to a nick_kp@rad.net.id and to me. My email address begins with an "M" and, not for the first time, RJB inadvertently inserted my address instead of Mega's. It was clear from the email that Mr. Horwich had been in contact with my printer. I became concerned that Playmore may have taken certain actions that created a commitment or liability for Waldman. Attached as Exhibit 8 is a true and accurate copy of the March 30th email.

28. As I indicated above, when Mr. Horwich and I had a conversation in February about the relationship of our companies, he claimed that Playmore owned 50% of each copyright but he was certain that there was no written agreement between the parties.

29. Neither my mother, nor anyone else at Waldman was aware of the existence of any written agreement between the companies with regard to copyrights.

30. In March 2007 as a result of Mr. Horwich's claim that Playmore had a 50% ownership interest in Waldman copyrights I asked our intellectual property lawyers, Proskauer Rose LLP ("Proskauer"), to provide me with a clarification of the companies' respective rights to the copyrights. I informed Proskauer that there was no written agreement regarding copyrights.

31. On March 14, 2007, Proskauer advised me that in the absence of a written agreement, Waldman did not have any ownership interest in the copyrights and that Waldman owned 100% of the copyright interest. Attached as Exhibit 9 is a true and accurate copy of the March 14, 2007 opinion letter I received from Proskauer.

32. On April 5, 2007, I sent an email to RJB to make sure it was clearly understood that RJB and its printers were not authorized to print or ship Waldman's Products without my permission.

33. Based on the Proskauer opinion letter, I also informed RJB that Waldman was the 100% owner of the copyright.

34. As indicated in Laurence Tauber's affidavit, sworn to April 20, 2007, within the past three weeks, Horwich and his attorneys referred for the first time to an undefined 1985 written agreement concerning copyrights. Both Horwich and his attorney refused our repeated requests to present a copy of that agreement for our review, which caused my attorneys and me to doubt its existence and validity. I therefore continued to operate under the assumption that it did not exist.

35.    I saw the document for the first time when served with this motion. While I leave to the lawyers its legal validity, I must state that this document is not in Waldman's files and nobody connected with the company, including lawyers and accountants, know of the existence of this document.

_____<br>MICHAEL GOBER

Sworn to before me this 20th
day of April 2007

_____
Notary Public

YAMUNA BHASKARAN
Notary Public, State of New York
No. 02BH6105184
Qualified in New York County
Commission Expires 02/02/20 08

11