UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PLAYMORE INC., PUBLISHERS,

                      Plaintiff,

           v.

WALDMAN PUBLISHING CORP.,

                      Defendant.
------------------------------------------------------------X

Case No.: 07 CV 3057 (LBS)

**AFFIDAVIT OF ANNE WALDMAN-GOBER**

STATE OF NEW YORK    )
                                      ss:
COUNTY OF NEW YORK  )

Anne Waldman-Gober, being duly sworn, deposes and says:

1. I am the President of Waldman Publishing Corp. ("Waldman") and submit this affidavit in opposition to Playmore Inc., Publishers' ("Playmore") motion for a preliminary injunction. I have personal knowledge of the matters set forth herein.

2. I have read the affidavit of Jon Horwich in support of Playmore's motion; it is factually inaccurate and incomplete. Given the time limitations in responding to this motion, however, I am unable to address each inaccuracy and error. Accordingly, I will focus only on the issues counsel has advised me are relevant to the motion for injunctive relief.

3. Waldman, founded by my father Israel Waldman in 1961, is in the business of publishing and creating children's books, children's playing cards and other related items (the "Products"). My father ran the company autocratically. He made all significant decisions and controlled the company in an absolute manner. I began working with my father at Waldman in or about 1988, and became president in 1996 after he passed away. My brother Herschel

Waldman, who worked on the creative side of the company, left in April 1997, shortly after my mother, a director of the company, appointed me to succeed my father as president. Herschel died in August 2001.

4. For the past several decades, Waldman sold Products exclusively to Playmore, and Playmore sourced the Products exclusively from Waldman. There has never been any written agreement between Waldman and Playmore memorializing or formalizing the business relationship. Indeed, Jon Horwich has told me on many occasions that the relationship is based only on a "handshake."

5. Waldman and Playmore never entered into a partnership agreement. Each company had its own employees, and neither exercised any control or authority over the employees of the other company. The companies maintained separate books and records, separate bank accounts and filed separate tax returns. Neither company received a K-1 from the other, and never filed a form 1065 Partnership Tax Return. The companies paid all expenses out of revenues of the sales of Products, and then divided the profits evenly. Given the fact that all monies flowed through Playmore, it was imperative that Waldman be given access to key financial information, such as Product sale prices, accounts receivables, and gross margins.

6. It is my understanding that the relationship between my father and Robert Horwich was a good one, and while there were disagreements along the way, the two separate companies managed to work together profitably and in harmony. Unfortunately, as described further below, this harmony did not continue into the next generation.

7. As the publisher and creator of the Products, Waldman hires the artists, authors and illustrators, places orders for the Products with the printers, and stores the Products at its warehouse in Ludlow, Massachusetts (the "Warehouse"). Waldman is solely responsible for the

costs of creation, printing, shipping to the Warehouse, and storage of the Products. Waldman is the sole tenant on the Warehouse lease, and solely responsible for its rent and other operating expenses.

8. Jon Horwich tries to paint a picture of a blissfully harmonious relationship between the companies that lasted until my son, Michael, joined Waldman as Chief Operating Officer ("COO"). Nothing could be further from the truth. Jon and I long have had a strained relationship. He was and is volatile, and has always gotten his way by bullying me. He often cut me out of important conversations, sent screaming emails to me, was dismissive of Waldman's legitimate concerns, and consistently denied Waldman access to crucial information. My father would never have tolerated that sort of behavior from Playmore or any other company with which he did business. I am different from my father, and Jon from his, and we never enjoyed the sort of mutual respect that our respective fathers shared.

9. While separate companies, given the fact that Waldman had only one distributor and Playmore only one supplier, it was imperative that we work together. Given also that Waldman's financial viability was dependent on payments it received from Playmore, it was crucial that Waldman have access to financial records and that payments be timely made. Despite repeated requests, Jon refused to permit access to any such information, leading to an atmosphere of distrust. Waldman needed accurate information from Playmore for all of the usual business reasons, like tax planning and financial controls, and also because Waldman placed orders with printers based upon the quantities and types of Products Playmore claimed it needed. This led often to purchases of quantities for which there were no buyers. Waldman, not Playmore, then was stuck with excess inventory in its Warehouse, and suffered losses as a result.

10. Waldman was solely responsible for paying the printers for the Products it ordered. For its part, Playmore only paid us for the cost of the Product that we subsequently shipped from the Warehouse to Playmore's customers. To the extent we ordered Products from the printers that were *not* sold by Playmore, as often was the case, Waldman was nevertheless obligated to expend the funds to pay the printer, which obviously had a large impact on its cash flow and operating expenses. At any given time there was several million dollars of inventory sitting in the Warehouse. Accordingly, Waldman always had concerns about slow moving or excess Products.

11. The financial arrangement between the companies essentially required Playmore to pay Waldman, on or about the 15th day of the month after Products were shipped to Playmore's customers, 100% of the cost of the Products and 50% of the gross profit of the sales (i.e., if the particular book cost Waldman $1.00 to print and the resale price of the book to the customer by Playmore was $1.50, Playmore would pay us $1.25 per book on the 15th of the month after we shipped). There were other aspects to our financial arrangement, such as reimbursement to Waldman of half of the expenses associated with art and editorial, cartons, shrink films and pallets, on a monthly basis. In addition, there were informal expense and investment equalization arrangements which were agreed upon between my father and Bob Horwich in the early days of their cooperation. One of the problems that arose during my tenure as President of Waldman was that the back-up data underlying the payments from Playmore to Waldman was provided on a less and less frequent and less and less transparent basis. The result was that Waldman had increasingly limited visibility into the risks that it was taking in order to print and distribute Products to the marketplace. For example, I would often find out only after the fact that Playmore had decreased the sales price at which it had sold a particular Product to a

customer. As a result, only after the fact was I able to determine that Waldman had actually lost money on that particular Product. This type of situation arose on an ongoing basis and with increasing frequency, and I very often made clear to Jon that I was dissatisfied with the arrangement.

12. Compounding the problem between the two companies was the fact that customers with which Playmore dealt could cancel orders for shipments at anytime. For example, Playmore could tell us that it expected a large order from a retailer, and therefore the items must be ordered and in the Warehouse for shipment by a certain date. Waldman would order the Product, incur the financial obligation to its vendors, and Playmore could and often would inform Waldman that the expected order did not materialize. Since Playmore did not sell those items, Waldman was required to carry the inventory, incurring substantial inventory holding costs, and was often forced to sell the inventory at close-out prices.

13. I mentioned above that Jon Horwich refused to disclose financial information to Waldman. This practice had severely negative financial effects on Waldman. For example, in 2002, Playmore informed Waldman of overstatements of sales that occurred in 1999 and 2000, respectively, requiring adjustments. Playmore never provided back-up or support for this. Waldman long had closed its books for those years, issued financial statements, filed tax returns and paid income taxes. Waldman was not notified of the error, which required a $92,000 adjustment for 1999-2000, until 2002.

14. This prompted our accountant to write to Playmore's accountants, seeking to obtain information on a timely basis. Exhibit 1. Our accountant complained about the fact that while Waldman provided Playmore with inventory figures, Playmore kept Waldman in the dark on issues related to sales and accounts receivables.

15. Indeed, the financial condition of Waldman substantially deteriorated since 2003. (See Exhibit 1). Our accountants recently strongly advised us that if Waldman did not change its way of doing business, it would be forced to close its doors. Playmore kept Waldman in the dark on issues related to sales discounts and allowances and aging of accounts receivables.

16. Despite a follow-up letter one month later (Exhibit 2), Playmore's accountants never responded to this inquiry, and the situation never improved.

17. The issue of excess inventory was a constant source of tension between Jon and me. Attached as Exhibit 3 is a sample of the ongoing email correspondence between Jon and me regarding Waldman's inventory concerns.

18. In recent years, the burden of this excess inventory and the financial relationship between Waldman and Playmore took a dramatic toll on Waldman's financial health and began crippling the company that my father built (Exhibit 4). This situation took an enormous emotional and physical toll on me and prompted me to relinquish some of my responsibilities to Michael.

19. Playmore has attached a document that it claims is an assignment of 50% of Waldman's rights in copyrights it owns to Playmore. I have reviewed that document purportedly signed by my brother Hershel in 1985. I will leave to the lawyers whether this is a valid assignment or not. What I can say is that I have never seen this document before April 16, 2007, Herschel did not have authority to sign any such document, Robert and Jon Horwich knew that my father Israel was the only person authorized to sign any type of agreement that affected the company in such a significant way, and that it is counter to the constant statements by Jon that there are no written agreements between the parties. I personally have searched Waldman's records, and have not located any such document, or any reference to such document. In all of

6

my years as president of Waldman and countless conversations with Jon Horwich, no-one has ever mentioned that such a document existed.

20.     In Mr. Cohen's affidavit at paragraph 23, he alleges, based on nothing, that my late brother-in-law, Charles Guttman, Esq., was involved in drafting the 1985 document. Mr. Guttman was my legal advisor with regard to intellectual property matters, and he never informed me of this document even though we had many discussions regarding Waldman's intellectual property over the years. Therefore, Mr. Cohen's unsubstantiated allegation regarding Mr. Guttman's involvement in the preparation of this document, and the document itself, is highly suspect[1]. Our corporate counsel in the mid-1980s, Richard Miller, in his affidavit, confirms the suspicious nature of this newly discovered document.

21.     To try to bolster its claim of copyright ownership, Horwich attached as exhibit J to his affidavit one copyright assignment by an author to both companies. Based on this one example, Mr. Horwich suggested that this joint assignment was typical. To the contrary, it was the exception. Attached at Exhibit 5 is a mere sampling of the substantial documentation were executed over the years that assigned the intellectual property rights only to Waldman. To the extent there are any agreements that assign the rights to both Waldman and Playmore, they are for a fraction of the Products produced and created by Waldman.

_____
ANNE WALDMAN-GOBER

Sworn to before me this
20th day of April, 2007

_____
Notary Public

YAMUNA BHASKARAN
Notary Public, State of New York
No. 02BH6105184
Qualified in New York County
Commission Expires 02/02/20__

---

[1]     Mr. Guttman passed away last month.

7